HEATHER S. NYONG'O (S.B. #222202)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California Street, Suite 2400
San Francisco, CA 94108
Telephone: (415) 796-4480
hnyongo@cgsh.com

*Counsel for Defendants SK hynix Inc. and SK hynix America Inc.*

DIANA A. AGUILAR ALDAPE (S.B. #304427)
SARA N. PAHLAVAN (S.B. #332945)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: (415) 984-8700
daguilar@omm.com
spahlavan@omm.com

*Counsel for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*

RACHEL S. BRASS (S.B. # 219301)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8293
rbrass@gibsondunn.com

*Counsel for Defendant Micron Technology, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

MARC GARCIAGUIRRE, et al.,

*Plaintiffs*,

v.

SAMSUNG ELECTRONICS CO., LTD., et al.,

*Defendants*.

Case No. 5:26-cv-06345-NW

**DEFENDANTS SAMSUNG ELECTRONICS, SK HYNIX, AND MICRON'S NOTICE OF MOTION AND MOTION TO DISMISS CLASS-ACTION COMPLAINT AND MEMORANDUM OF SUPPORTING POINTS AND AUTHORITIES**

**Oral Argument Requested**

| | |
|---|---|
| Hearing Date: | October 21, 2026 |
| Time: | 9:00 A.M. |
| Place: | Courtroom 3, 5th Floor |
| Judge: | Hon. Noël Wise |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Please take notice that on October 21, 2026, at 9:00 AM, or as soon thereafter as the matter may be heard, Defendants Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., SK hynix Inc., SK hynix America Inc., and Micron Technology, Inc. (together, the "Defendants") will and hereby do move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an Order dismissing the Plaintiffs' Class Action Complaint. The hearing will be held before the Honorable Noël Wise in Courtroom 3 of the United States District Court for the Northern District of California, San Jose Division, located at 280 South First Street, San Jose, CA 95113.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the oral argument of counsel, and all other pleadings and proceedings herein.

## STATEMENT OF ISSUE TO BE DECIDED

Whether Plaintiffs' federal and state-law claims comply with Federal Rule of Civil Procedure 8(a) as interpreted by the U.S. Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and by the United States Court of Appeals for the Ninth Circuit in *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 28 F.4th 42 (9th Cir. 2022) ("*DRAM II*"), *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015) ("*Musical Instruments*"), and other cases, and specifically whether the Court should dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) because its allegations do not give rise to a plausible inference of an antitrust conspiracy among Defendants.

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. SUMMARY OF RELEVANT ALLEGATIONS ........ 2

A. The DRAM Industry. ........ 2

B. The DRAM "Winter" of 2022-2023. ........ 3

C. The AI Boom Ends the DRAM "Winter" and Sets Off a Race to Produce HBM. ........ 4

D. Plaintiffs Sue the DRAM Manufacturers in June 2026. ........ 6

III. LEGAL STANDARD ........ 7

IV. ARGUMENT ........ 7

A. Plaintiffs do not plausibly plead an unlawful agreement among Defendants, the gravamen of each of their federal and state-law claims. ........ 8

i. Plaintiffs do not allege parallel conduct suggestive of agreement and, at most, allege lawful conscious parallelism. ........ 9

ii. None of Plaintiffs' "plus factor" allegations raise an inference of conspiracy. ........ 11

(1) An alleged "common motive" to raise prices does not support an inference of conspiracy. ........ 12

(2) Each Defendant acted rationally and in furtherance of its economic self-interest. ........ 13

(3) Defendants' ordinary business activities do not amount to "opportunities to conspire." ........ 17

(4) Defendants' business decisions were not simultaneous. ........ 18

(5) Defendants' public financial communications were unilateral, lawful, and unremarkable, not signals to restrain trade. ........ 20

(6) The structure of the alleged DRAM market is a neutral fact, not a plus factor. ........ 21

(7) Decades-old antitrust litigation and *DRAM II*, which was dismissed at the pleading stage, do not support a plausible inference of conspiracy. .................................... 22

B. Plaintiffs' State-Law Claims Should Be Dismissed. ................................. 23

V. CONCLUSION ........................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... i, 7

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) .......... 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... i, 7, 8, 19

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) .......... 18, 22

*In re Concrete & Cement Additives Antitrust Litig.*,
2025 WL 1755193 (S.D.N.Y. June 25, 2025) .......... 9

*D'Augusta v. Am. Petrol. Inst.*,
117 F.4th 1094 (9th Cir. 2024) .......... 8

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
28 F.4th 42 (9th Cir. 2022) .......... *passim*

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Litig.*,
2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) .......... *passim*

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .......... 7

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
647 F. Supp. 2d 1250 (W.D. Wash. 2009) .......... 22–23

*Insulate SB, Inc. v. Adv. Finishing Sys., Inc.*,
797 F.3d 538 (8th Cir. 2015) .......... 24

*Jones v. Micron Tech., Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019) .......... *passim*

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) .......... 7

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) .......... 8

*In re Musical Instruments and Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .......... *passim*

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*,
795 F.3d 1124 (9th Cir. 2015) .......... 12

*Prosterman v. Am. Airlines, Inc.*,
747 F. App'x 458 (9th Cir. 2018) .......... 10

*QSGI, Inc. v. IBM Glob. Fin.*,
2012 WL 1150402 (S.D. Fla. Mar. 14, 2012) .......... 24

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
917 F.3d 1249 (11th Cir. 2019) .......... 18

*State v. Waste Mgmt. of Wis., Inc.*,
81 Wis.2d 555 (Wis. 1978) .......... 24

*Summit Health, Ltd. v. Pinhas*,
500 U.S. 322 (1991) .......... 1

*Univ. Grading Serv. v. eBay, Inc.*,
2012 WL 70644 (N.D. Cal. Jan. 9, 2012) .......... 24

*Williamson Oil Co., Inc. v. Philip Morris USA*,
346 F.3d 1287 (11th Cir. 2003) .......... 22

**Statutes**

Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*
(2026) .......... 24

Sherman Act §1, 15 U.S.C. § 1 .......... 6

**Other Authorities**

Federal Rule of Civil Procedure 8(a) .......... i

Federal Rule of Civil Procedure 12(b)(6) .......... i

P. AREEDA & H. HOVENKAMP, ANTITRUST LAW (Supp. 2026) .......... 3, 13, 22

## I. INTRODUCTION

In *DRAM II*, the Ninth Circuit affirmed the dismissal of an inadequately pleaded claim that three manufacturers of dynamic random-access memory ("DRAM") conspired to restrict output and fix prices. 28 F.4th at 53–54. This case recycles the same legal theory, based on the same kind of allegations, against the same Defendants. The few new allegations—notably those related to the shifts in the market to accommodate the recent AI boom—do not change the fundamental story and do not cure the defects in *DRAM II*. In sum, three companies in a highly concentrated market independently reduced production amid falling prices during a "bust" cycle, and then shifted capacity toward more profitable products in response to surging AI-driven demand. Just as the Ninth Circuit held in *DRAM II*, the Complaint alleges facts that are consistent with the ordinary, rational conduct of competitors facing common market pressures. No plausible indicia of a conspiracy emerge from this common-sense business conduct.

The Court should therefore apply *DRAM II* and dismiss the Complaint for failure to state a claim. *First*, Plaintiffs do not plausibly plead the "essence of any violation of § 1 [of the Sherman Act]": that Defendants entered into an unlawful agreement. *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991). The Complaint alleges no direct evidence of an agreement to restrict capacity and limit supply—there are no conspiratorial communications, admissions, documents, or witness accounts alleged. Nor do Plaintiffs plausibly plead either part of a circumstantial case: parallel conduct or conspiracy "plus factors." Defendants' responses were staggered over months and differed in timing and degree, while each was independently rational in light of the economic conditions alleged. And Plaintiffs allege no "plus factors" that plausibly transform those independent responses to common market pressures into an unlawful agreement. As the Ninth Circuit held in *DRAM II*, to state a claim, Plaintiffs "must allege something more than conduct merely consistent with agreement in order to 'nudge[] [antitrust conspiracy] claims across the line from conceivable to plausible,'" 28 F.4th at 47 (citing *Twombly*, 550 U.S. at 570), and "open the floodgates" of antitrust discovery, *id.* at 53 (citing *Twombly*, 550 U.S. at 559). As in *DRAM II*,

rather than burden Defendants with potentially enormous discovery expenses in response to implausible allegations, the Court should dismiss the Complaint.

*Second*, Plaintiffs do not plead a claim under state law. Each state-law claim is derivative of, and therefore fails for the same reasons as, Plaintiffs' federal antitrust claim. This is no different than *DRAM II*. As the Ninth Circuit held there, "Plaintiffs' claims brought under California's Cartwright Act, Unfair Competition Law, and the antitrust laws of five other states are all premised upon the existence of an antitrust conspiracy, and therefore rise and fall with the Sherman Act claim." *Id.* at 54 n.7.

## II. SUMMARY OF RELEVANT ALLEGATIONS

### A. The DRAM Industry.

Defendants manufacture DRAM, "a semiconductor chip that provides temporary, high-speed data storage for electronic processors." Compl. ¶ 52. The device storage that DRAM enables "directly determines how many applications can run simultaneously, how large a data set can be processed in memory, and how responsive the system feels to its user." *Id.* ¶ 56. As a result, DRAM forms "the backbone of nearly every computing device on Earth." *Id.* ¶ 1.

Although there are many different DRAM products, the Complaint divides them into two categories: "conventional DRAM" and "High Bandwidth Memory" ("HBM"). *Id.* ¶¶ 59, 116, 118. Under this definition, conventional DRAM includes DDR4, DDR5, LPDDR5X, GDDR6, and GDDR7 chips made for PC, servers, smartphones, laptops, and automobiles. *Id.* HBM DRAM is a specialized product designed for use in AI accelerators. *Id.* DRAM chips are sold to a variety of purchasers, from chip designers like NVIDIA and OEMs like Dell and Apple, to data-center operators, memory-module assemblers, and other resellers. *See id.* ¶¶ 66, 91.[1]

Defendants Samsung, SK hynix, and Micron "make almost all of the world's [DRAM] supply, together accounting for more than ninety percent of DRAM revenue." *Id.* ¶¶ 1, 72–74. Chinese manufacturers account for the rest of the alleged market; they largely produce prior-generation DDR4 chips and sell them at steep discounts. *Id.* ¶¶ 74, 264. Because the DRAM

[1] Plaintiffs allege NAND, or "NAND flash," is a different type of memory for data storage. *Id.* ¶ 52.

industry comprises a few large participants, it is an "oligopoly." *See id.* ¶¶ 1–4, 51, 72–74, 94. "[T]he distinctive characteristic of oligopoly is recognized interdependence among the leading firms: the profit-maximizing choice of price and output for one depends on the choices made by others, in a way that is significant enough to be measurable." P. AREEDA & H. HOVENKAMP, ANTITRUST LAW ¶ 404 (Supp. 2026). The Complaint also alleges substantial public visibility into industry supply, demand, capacity, and profitability, including through data services such as TrendForce. *See* Compl. ¶¶ 10, 12, 82–84, 91, 173–76, 277–79, 282, 285, 287, 291, 388, 399, 404, 411, 414, 424, 436, 444.

Defendants manufacture DRAM in semiconductor fabrication plants ("fabs"), specialized factories that process silicon wafers into chips. *Id.* ¶ 62. Expanding DRAM production capacity is massively expensive and slow. Fabs require investments of $30 to $50 billion over five to seven years to build out to competitive scale. *Id.* ¶ 79. DRAM production equipment is also expensive, specialized, and scarce. *Id.* ¶ 63. For example, one company in the world almost exclusively manufactures the extreme ultraviolet lithography machines required to make modern DRAM chips. *Id.* ¶ 85. A single fab may require dozens of these machines, yet the company, ASML, only makes 50 of them per year, and "its order backlog extends years into the future" (even though each machine costs more than $200 million). *Id.* The United States government further constrains DRAM supply—it promulgated sweeping export controls in October 2022, restricting Chinese firms' access to advanced chipmaking equipment. *Id.* ¶ 92. Thus, although Defendants are striving to expand DRAM production capacity, it will take years for those efforts to bear fruit given the intensity of the capital investments and the long lead-time that these projects require. *Id.* ¶¶ 292–93.

**B. The DRAM "Winter" of 2022-2023.**

Today's booming demand for DRAM looks nothing like the bust that preceded it. "In late 2022, DRAM demand was weak and prices were falling." *Id.* ¶ 7. Each Defendant reported significant losses: "Samsung reported a KRW 4.58 trillion [$3.51 billion] operating loss in its semiconductor division for the first quarter of 2023. SK [h]ynix reported an operating loss of KRW 3.402 trillion [$2.61 billion] for the first quarter of 2023. Micron reported a net loss of

$5.833 billion for its fiscal year end[ing] August 31, 2023." *Id.* ¶ 241. In short, DRAM manufacturers in 2022 and early 2023 faced a supply glut, weak demand, falling prices, and multi-billion dollar losses. *Id.* ¶¶ 7, 241.

Each company responded. Facing mounting losses and a growing pile of unsold inventory, each company reduced its investment and production in loss-making DRAM. On October 26, 2022, SK hynix announced a planned reduction of approximately 50% in 2023 capital expenditures ("capex"), together with production cuts of certain lower-margin products and "a year-over-year reduction in DRAM and NAND wafer production." *Id.* ¶ 235. On November 16, 2022, Micron announced that it was reducing its own DRAM and NAND wafer starts "by approximately 20% versus fiscal fourth quarter 2022." *Id.* ¶ 236. By contrast, "[a]s of January 2023, Samsung had not announced production cuts and had said it would maintain its 2023 capital spending at a level similar to 2022." *Id.* ¶ 238. Not until April 2023—roughly six months after SK hynix's announcement, and billions of dollars of losses later—did Samsung announce that it was "lowering the production of memory chips by a meaningful level." *Id.* ¶ 240. These staggered cuts responded directly to the "excess inventory" Defendants produced but could not sell. *See id.* ¶ 250.

### C. The AI Boom Ends the DRAM "Winter" and Sets Off a Race to Produce HBM.

The arrival of AI chatbots in 2023 reshaped the economics of the DRAM industry; it caused "demand [to] return[] in force" and suddenly "drove buyers to acquire memory in volumes the industry had not seen." *Id.* ¶ 8. The new demand largely centered on HBM, a "high-margin DRAM product used in AI accelerators." *Id.* ¶ 251. HBM is a high-value, strategically important growth product driven by AI demand, but fabricating it requires substantial long-term investment and customer commitments. *Id.* ¶¶ 8, 79, 150, 152, 192, 256, 354. Each Defendant chased that opportunity, sharply increasing capital expenditures on "high-value products" like HBM. *Id.* ¶ 277. For example, Micron's capital expenditures ballooned from $7.68 billion in fiscal year 2023 to an estimated $25 billion in fiscal year 2026. *Id.* ¶ 276. Those investments made good sense: Throughout nearly the entirety of the relevant time period (2022 to the present), HBM was

more profitable than conventional DRAM, and commanded a premium until at least the spring of 2026. *Id.* ¶¶ 12, 60, 152, 377.

Fabricating HBM comes with a tradeoff: It requires three to four times more silicon wafer area than "conventional" DRAM because it "consists of multiple DRAM dies [individual chips] vertically stacked and interconnected." *Id.* ¶¶ 11, 148, 150, 252, 373. Because shifting production from conventional DRAM to HBM requires significant time and investment, Defendants built or expanded HBM-dedicated facilities and converted existing conventional DRAM production lines to HBM. *Id.* ¶¶ 160–65, 283. As Micron's business chief explained, "[w]hen Micron makes one bit of HBM memory, it has to forgo making three bits of more conventional memory for other devices." *Id.* ¶¶ 11, 373. Or as Plaintiffs put it, "a modest shift toward HBM withdraws a disproportionate share of commodity supply." *Id.* ¶ 4; *see also id.* ¶ 65.

AI companies' demand for high-margin HBM quickly became all-encompassing. For example, OpenAI's Stargate data-center project alone called for the output of 900,000 DRAM wafers per month—40% of total worldwide monthly DRAM output if it were to materialize. *Id.* ¶ 303. Each Defendant responded by de-prioritizing lower-margin, prior-generation DRAM and pivoting to HBM. Samsung and SK hynix retired legacy (and increasingly obsolete) DDR3 production lines in 2024, and Micron produced DDR3 only in limited quantities. *Id.* ¶ 259. Defendants also allegedly wound down mainstream DDR4 production on different timelines as they faced growing "competitive pressure from Chinese manufacturers," who sold DDR4 chips at half the price of Defendants' chips. *Id.* ¶¶ 260, 264. Micron then closed its Crucial direct-to-consumer DRAM business to focus on HBM. *See id.* ¶¶ 306, 324. Amid the shift, there was no DRAM to spare: AI demand had effectively sold out the industry. *Id.* ¶ 17. These decisions paid dividends: Samsung and SK hynix "earned record profits at operating margins above seventy percent," *id.* ¶ 17, and Micron reported DRAM revenue of $18.8 billion in Q2, a 207% increase year over year, *id.* ¶ 187.

In late 2025 and early 2026, the spread between the margins for certain conventional DRAM products and HBM began to narrow or even flip, as demand for conventional DRAM intensified. *Id.* ¶¶ 376–77. But, as noted, DRAM fabs are "highly specialized" and "cannot be

readily converted to produce other types of semiconductors." *Id.* ¶¶ 63, 155, 160–61. That means companies cannot quickly transition production lines: For example, it took SK hynix the better part of a year to convert one conventional DRAM production line to HBM. *Id.* ¶ 162. Contractual commitments also limited Defendants' ability to quickly transition lines between conventional DRAM and HBM—Micron presold all of its HBM output through 2026, and Samsung committed multiple fab lines to HBM. *Id.* ¶ 283. And the process of building new lines and fabs can take the better part of a decade; according to the Complaint, Micron announced a new DRAM fab in 2022 and does not expect it to begin production until late 2030, underscoring "the multi-year lag inherent in DRAM capacity expansion." *Id.* ¶ 81.

**D. Plaintiffs Sue the DRAM Manufacturers in June 2026.**

On June 25, 2026, Plaintiffs filed suit alleging that Defendants violated Sherman Act § 1 and various state-law analogues by conspiring to restrict DRAM supply. *See id.* ¶¶ 481–555. Plaintiffs seek to represent classes of indirect purchasers who purchased "conventional DRAM products" from October 26, 2022, through the present (the "Class Period"). *Id.* ¶ 458.

According to the Complaint, the alleged conspiracy began on October 26, 2022, when SK hynix unilaterally announced to investors that it would reduce capital expenditures in 2023. *Id.* ¶ 235. Three weeks later, Micron announced that it intended to slow wafer starts to manage inventory. *Id.* ¶ 236. Samsung said nothing until January 2023, when it indicated it would not alter its capex plans. *Id.* ¶ 238. Then, three months later—after reporting a loss of KRW 4.58 trillion (~$3.51 billion) for Q1 2023—Samsung announced that it would "lower[] the production of memory chips by a meaningful level." *Id.* ¶ 240.

Beyond these public announcements, the Complaint is nearly silent on the mechanics of the alleged conspiracy. It devotes only sixteen of its 555 paragraphs to supposed "signals" that Defendants allegedly sent to each other through responses to analysts' and investors' questions on public earnings calls and events in 2023 and 2024. *Id.* ¶¶ 335–351. Plaintiffs excerpt snippets of these statements and ascribe nefarious intent to ordinary terminology describing supply and demand, company strategy, and high-level projections. *Id.* But even Plaintiffs acknowledge that Wall Street analysts used the very same terminology in describing the market. *Id.* ¶ 345.

## III. LEGAL STANDARD

To survive a motion to dismiss, an antitrust plaintiff must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545, 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555); *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Allegations cross the threshold from possible to plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Allegations that are "merely consistent with" plaintiffs' liability theory do not cross the plausibility threshold. *Twombly*, 550 U.S. at 545, 557. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint must be dismissed. *Iqbal*, 556 U.S. at 679.

To meet these requirements in the context of an antitrust conspiracy, a plaintiff "must plead not just ultimate facts (such as a conspiracy), but *evidentiary* facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (emphasis added) (citing *Les Shockley Racing Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989)); *see also DRAM II*, 28 F.4th at 46, 54 (affirming dismissal due to failure to allege sufficient evidentiary facts).

## IV. ARGUMENT

Plaintiffs' Complaint is essentially a repackaged version of the conspiracy the Ninth Circuit rejected in *DRAM II*. There, the Circuit held that "the totality of Plaintiffs' allegations d[id] not suggest anything more than conscious parallelism," and it explained that "[t]he four plus factors that Plaintiffs contend are most indicative of conspiracy—simultaneous capex decreases, 'perilous' supply cuts, public statements about the market forecast, and changed conduct between 2016 and 2018—are all consistent with Defendants, as competitors in a highly concentrated

market, reacting to the same market pressures and taking parallel action to serve their interests." *DRAM II*, 28 F.4th at 53. That description fits Plaintiffs' allegations in this case like a glove.

**A. Plaintiffs do not plausibly plead an unlawful agreement among Defendants, the gravamen of each of their federal and state-law claims.**

Plaintiffs' allegations suggest independent decision-making, not a conspiracy. A conspiracy is a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). Plaintiffs never describe the alleged agreement with any specificity: They do not identify its terms, each Defendant's role, or how it was implemented, monitored, or enforced. *See Musical Instruments*, 798 F.3d at 1193 n.5 (affirming dismissal of complaint that failed to explain "how the alleged conspiracy was organized and carried out"). While that is reason enough to dismiss the Complaint, Plaintiffs fail to support the alleged conspiracy—whatever it is intended to be—through either direct or circumstantial allegations.

The Complaint first alleges no direct evidence of agreement—that is, evidence that "requires no further inference." *D'Augusta v. Am. Petrol. Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024). There are no allegations of an employee confession, "smoking gun" document, or allegedly conspiratorial communications among Defendants.

Plaintiffs instead stake their case on a circumstantial theory: allegations that "raise[] a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557. This requires alleging both parallel conduct and "plus factors" that support a plausible inference of conspiracy. *Musical Instruments*, 798 F.3d at 1193–94; *see also Jones v. Micron Tech., Inc.*, 400 F. Supp. 3d 897, 915 n.10 (N.D. Cal. 2019) (plaintiff must allege "[b]oth parallel conduct and plus factors . . . in order to state a claim under § 1 of the Sherman Act"). The Complaint alleges neither. Instead, it pleads rational business conduct consistent with each Defendant's independent self-interest. To the extent the allegations suggest parallel conduct at all, Plaintiffs fail to "plead 'some further factual enhancement' that places the[m] … in a context suggesting a preceding agreement." *DRAM II*, 28 F.4th at 45 (citing *Twombly*, 550 U.S. at 557). Here, as in *DRAM II*, Plaintiffs' allegations at most

"reveal [no]thing more than similar reaction to similar pressures within an interdependent market, or conscious parallelism." *Id.* at 48 (quoting *Musical Instruments*, 798 F.3d at 1196).

**i. Plaintiffs do not allege parallel conduct suggestive of agreement and, at most, allege lawful conscious parallelism.**

Adequately pleading parallel conduct is necessary but not sufficient to plead an antitrust conspiracy. *See Musical Instruments*, 798 F.3d at 1193. Courts have long recognized that, independent of any conspiracy, parallel conduct is more likely in concentrated, oligopolistic markets. *See, e.g.*, *DRAM II*, 28 F.4th at 47 n.2 (citing *Musical Instruments*, 798 F.3d at 1193). This phenomenon is known as "conscious parallelism," which "occurs when two or more firms in a concentrated, interdependent market base their actions in part on the anticipated reactions of their competitors." *Id.* Participants in oligopolistic markets "thus 'arrive at identical decisions independently, as they are cognizant of—and reacting to—similar market pressures.'" *Id.* (quoting *Musical Instruments*, 798 F.3d at 1193).

To start, Plaintiffs do not allege that Defendants acted in parallel. The Complaint concedes that Defendants' decisions were "staggered," not lockstep. Compl. ¶ 242. For example, there was a six-month gap between their announcements to reduce DRAM production when facing cratering demand in 2022 and 2023—and each did so by differing amounts. *See id.* ¶¶ 235–36, 238, 240. This conduct bears no resemblance to the sort of parallel action one would expect of a cartel. Indeed, there was a four-month gap between each company's alleged exits from DDR4 production, *id.* ¶ 260, and Micron continued to produce increasingly obsolete DDR3 well after Samsung and SK hynix retired their DDR3 production lines, *see id.* ¶ 259. This is not consistent with a conspiracy. *See, e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 131–32 (3d Cir. 1999) (holding that time lags of three to six months between pricing moves "refute rather than support" allegations of conspiracy); *In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *13 (S.D.N.Y. June 25, 2025) ("[U]nseasonably long delays between the allegedly parallel acts will 'refute rather than support' allegations of conspiracy.") (quoting *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014)).

But even if these could be considered "parallel production cuts," followed by parallel "shift[s] ... to HBM," Compl. ¶ 100, the Complaint would present nothing more than "a restatement of the conscious parallelism endemic to an oligopoly." *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 461 (9th Cir. 2018). Parallel conduct like this is unremarkable in an oligopoly and insufficient to state a conspiracy claim as a matter of law. *DRAM II*, 28 F.4th at 53–54; *Musical Instruments*, 798 F.3d at 1193–94, 1196. As the Ninth Circuit has explained, "[e]ven assuming that the progressive adoption of similar policies across an industry constitutes simultaneity, that fact does not reveal anything more than similar reaction to similar pressures within an interdependent market, or conscious parallelism." *Musical Instruments*, 798 F.3d at 1196; *accord DRAM II*, 28 F.4th at 53. That is all the Complaint describes here.

Take the 2022-2023 cuts. Setting aside Plaintiffs' label, the *facts* that Plaintiffs allege are that, facing weak demand, low prices, and mounting losses, Defendants each ultimately decided (at different times and in different degrees) to reduce production volume and capex plans. *See* Compl. ¶¶ 7, 235–41. Those allegations provide an obvious independent explanation for the production cuts: Defendants were incurring *billions of dollars* of losses, *see id*. ¶ 241, while facing excess supply, *see id*. ¶¶ 246, 250. And because these seriatim supply cuts were public, *id.* ¶¶ 235–36, 240, it is entirely rational (and lawful) that each firm would see what its competitors did, assess the impacts of those actions on the marketplace, and decide to take the same rational economic action. *See Musical Instruments*, 798 F.3d at 1195 ("[P]laintiffs fail to account for conscious parallelism and the pressures of an interdependent market."). Indeed, this is no different than *DRAM II*: "[T]hat Defendants reduced their capex toward DRAM supply growth independently in response to market pressures" does "nothing ... [to] suggest[] a preceding agreement." 28 F.4th at 49; *see also In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Litig.*, 2020 WL 8459279, at *4 n.6 (N.D. Cal. Nov. 24, 2020) ("*DRAM II*") ("[I]nterdependen[ce] may often produce economic consequences that are comparable to those of classic cartels," but this "stems from the nature of oligopoly, not conspiracy as such, which courts cannot remedy.") (quoting *In re Coordinated Pretrial Procs. in Petrol. Prods. Antitrust Litig.*, 906 F.2d 432, 444 (9th Cir. 1990)).

The same is true for the "HBM pivot." When demand for HBM surged in 2023, each Defendant responded (as a rational business would) by shifting its investments in production capacity over several years to a higher-margin product with strong and strategic growth prospects—and closely scrutinizing customers' requests for scarce supply. *See* Compl. ¶¶ 251–58, 330, 354. Plaintiffs themselves acknowledge a massive AI-driven spike in demand for HBM; recognize that the potential for greater margins drove Defendants to focus on HBM; and concede that "the multi-year lag inherent in DRAM capacity expansion" made it difficult to quickly respond to subsequent changes in the relative margins of conventional DRAM and HBM. *Id.* ¶¶ 81, 251, 283, 354, 376–82 (noting HBM offered a "profitability advantage"). None of these developments bespeaks an *agreement* among companies to reduce supply. Quite the opposite: Defendants have engaged in unprecedented investments to expand production of HBM as they attempt to keep up with soaring AI-based demand. *Id.* ¶¶ 8, 79, 81, 150, 152, 255, 256, 276–77, 354.

Ultimately, Plaintiffs accomplish no more than their predecessors in *DRAM II*. A plaintiff proceeding on circumstantial evidence carries the "additional burden" of pleading "something more than conduct merely consistent with agreement" to "nudge[] their claims across the line from conceivable to plausible." *DRAM II*, 28 F.4th at 46–47 (citing *Twombly*, 550 U.S. at 570). But at best, Plaintiffs plead conscious parallelism, a phenomenon that "extreme market concentration also makes . . . more likely" and, therefore, is not indicative of a conspiracy. *Id.* at 52.

**ii. None of Plaintiffs' "plus factor" allegations raise an inference of conspiracy.**

As in *DRAM II*, Plaintiffs do not plead "plus factors" that could "elevate [any] allegations of parallel conduct to plausibly suggest the existence of a conspiracy." *Id.* at 47 (citing *Musical Instruments*, 798 F.3d at 1194). "Plus factors" are "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Id.* (quoting *Musical Instruments*, 798 F.3d at 1194). "Under the *Twombly* standard, plus factors serve as the 'something more' to place parallel conduct 'in a context that raises a suggestion of a preceding agreement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). When plus-factor

allegations could "just as easily suggest rational, legal business behavior," a court "cannot … infer an anticompetitive agreement." *Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*, 795 F.3d 1124, 1130 (9th Cir. 2015) (quoting *Kendall*, 518 F.3d at 1049).

Plaintiffs' allegations arguably speak to seven "plus factors": (1) common motive; (2) actions against self-interest; (3) opportunity to conspire; (4) simultaneous business decisions; (5) public signaling; (6) market characteristics conducive to coordination; and (7) a history of prior government enforcement and litigation. *See, e.g.*, *DRAM II*, 28 F.4th at 47; *Musical Instruments*, 798 F.3d at 1194. But most "are largely consistent with independent business conduct in a concentrated market," *DRAM II*, 28 F.4th at 51, and the rest are irrelevant. They do not support a plausible inference of conspiracy individually or holistically. *See id.* at 53–54 (holding the same in light of similar allegations).

**(1) An alleged "common motive" to raise prices does not support an inference of conspiracy.**

Plaintiffs suggest that Defendants were motivated to participate in the alleged conspiracy by the prospect of charging higher prices—to "reap[] the benefits" of a "supply cutting conspiracy." Compl. § V.N. But the Ninth Circuit has squarely rejected "common motive" as a "plus factor" in an interdependent market:

> Any firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors. Thus, alleging "common motive to conspire" simply restates that a market is interdependent (*i.e.*, that the profitability of a firm's decisions regarding pricing depends on competitors' reactions).
>
> *Musical Instruments*, 798 F.3d at 1194–95.

It is undisputed that Defendants operate in an "interdependent market." *DRAM II*, 28 F.4th at 51. But interdependence does not entail collusion, "as interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement." *Musical Instruments*, 798 F.3d at 1195.[2] Plaintiffs' allegations of higher prices—however dramatic—cannot transform lawful conscious parallelism into an unlawful conspiracy.

[2] To be sure, interdependence may result in "high prices for consumers." *DRAM II*, 2020 WL 8459279, at *4 n.6. But this "stems from the nature of oligopoly, not conspiracy as such," and courts cannot remedy it "short of instituting price controls." *Id.*

**(2) Each Defendant acted rationally and in furtherance of its economic self-interest.**

Actions against self-interest suggest a conspiracy only "where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *Musical Instruments*, 798 F.3d at 1195. "[E]conomically rational" conduct is not "extreme action against self-interest" that could qualify as a "plus factor." *DRAM II*, 28 F.4th at 50; *see also Musical Instruments*, 798 F.3d at 1195 ("An action that would seem against self-interest in a competitive market may just as well reflect market interdependence giving rise to conscious parallelism."). Plaintiffs repeatedly assert that Defendants' actions were irrational (and suspicious) because firms "in a competitive market" would have behaved differently. *See* Compl. ¶¶ 16, 264, 326, 333, 415, 443, 448. But that argument evaluates Defendants' conduct as though the Complaint alleges a traditionally competitive market, rather than the highly concentrated oligopoly Plaintiffs themselves plead. *See id.* ¶¶ 1–4, 51, 72–74, 94, 258, 336.

In oligopolistic or interdependent markets, "companies base their actions in part on the anticipated reactions of their competitors," *DRAM II*, 2020 WL 8459279, at *4 (quoting *Musical Instruments*, 798 F.3d at 1193), and "conscious parallelism is practically unavoidable." *Id.* In particular, an "oligopoly *differs from competition* in that substantial output variations by any one of the leading sellers have a noticeable impact on market price and on rivals." HOVENKAMP, ANTITRUST LAW ¶ 404a (emphasis added). The proper question, then, is whether Defendants acted rationally in an oligopoly, not whether Defendants acted rationally in a traditionally competitive market. Plaintiffs' allegations do not address this question and, as such, Plaintiffs do not plausibly allege that Defendants acted "'for no other discernible reason' than collusion." *DRAM II*, 28 F.4th at 48–49 (quoting *Twombly*, 550 U.S. at 556 n.4).

*Reduction in Production Volume (2022–2023).* Plaintiffs allege that Defendants reduced conventional DRAM production volumes in 2022–2023, and characterize these cuts as indicative of conspiracy. *See* Compl. ¶¶ 235–50. They assert that, once one Defendant cut production, the others should have expanded to "capture the demand being surrendered." *Id.* ¶ 352. That allegation does not plausibly show conduct against self-interest, particularly given the

oligopolistic market Plaintiffs themselves plead. Each Defendant was losing billions of dollars at the time, *see id.* ¶ 241, and the cuts responded to "excess inventory" that no Defendant could sell, *id.* ¶ 250. In short, there was no demand to be surrendered. It was economically rational for each manufacturer to hold production flat or reduce it in response to weak demand and mounting losses. The Complaint itself confirms that Samsung initially avoided production cuts for six months, incurred billions of dollars in losses, and then changed course. *Id.* ¶¶ 238, 240–41.

The Ninth Circuit made this very point in *DRAM II*: In an oligopolistic market, "it was economically rational for Samsung to reduce its supply growth below demand levels and for Micron and SK [h]ynix to maintain production commensurate with the market leader." 28 F.4th at 50. That reasoning applies with greater force here given the alleged over-supply and inventory glut. *See* Compl. ¶¶ 7–8, 241. It was likewise unremarkable that Defendants each allegedly reduced or eliminated production of DDR3 and DDR4, products that faced growing price competition from Chinese manufacturers and were quickly becoming technologically obsolete relative to DDR5 and HBM. *Id.* ¶¶ 74, 259–60, 264, 270.

*Reduction in Capital Expenditures (2022–2023).* Plaintiffs' theory that reducing future capex on conventional DRAM was irrational misses the mark as well. *See id.* ¶¶ 235–50. Plaintiffs again insist that, when one Defendant reduced investment, the others should have expanded to "capture the demand being surrendered." *Id.* ¶ 352. But in a segment in which each Defendant was allegedly losing billions of dollars, *id.* ¶ 241, "demand was weak[,] and prices were falling," *id.* ¶ 7, reducing investment was a rational and self-interested strategy. *See supra* Sections II.B, IV.A.i. Considering essentially the same situation in *DRAM II*, the Ninth Circuit explained that these allegations "align with a 'follow the leader' theory of conscious parallelism, as [the remaining market participants] could have independently and rationally reached the same decision to follow [a] market leader" in reducing capex. 28 F.4th at 48. That is precisely what Plaintiffs allege happened here: SK hynix cut capex, and Micron and Samsung followed one at a time over the next six months. As in *DRAM II*, this does not suggest a conspiracy.

*Pivot to HBM at the Expense of Other DRAM Production.* Plaintiffs' allegations also undercut their assertion that pivoting to HBM "was not economically rational but for its

anticompetitive effect." Compl. ¶ 11. They say that Defendants should have immediately pivoted back into conventional DRAM once the margins for that product overtook HBM's. *See id.* ¶¶ 376–82. But the Complaint alleges that *until at least spring 2026*, HBM "commanded" a premium over commodity DRAM. *Id.* ¶¶ 60, 152, 377. Although short-term fluctuations tightened margins between HBM and commodity DRAM in recent quarters, *see id.* ¶¶ 376–82, the long-term view was that HBM was the future and was growing. *See id.* ¶¶ 8, 192, 282–83. "AI demand explains why HBM became attractive," *id.* ¶ 354, and Defendants rationally responded to that demand shock by expanding HBM capacity. *See id.* ¶ 283.

Moreover, Plaintiffs' own allegations undermine the premise that Defendants could have quickly shifted capacity back to conventional DRAM. Defendants had already sunk substantial investments into HBM production. They committed to "through-silicon via" ("TSV") processing, *id.* ¶¶ 148, 161, 253; "purpose-built" advanced packaging facilities, *id.* ¶ 164; and to the conversion of production lines from conventional DRAM to HBM. *See id.* ¶¶ 162–63. Defendants could not quickly unwind those commitments in response to temporary fluctuations in commodity DRAM pricing, nor, as Plaintiffs' allegations confirm, could Defendants have converted capacity to conventional DRAM in the brief time between the alleged change in profitability and the time Plaintiffs filed the Complaint. *See id.* ¶ 81 ("The timeline from government commitment to first wafer illustrates *the multi-year lag inherent in DRAM capacity expansion*." (emphasis added)); *id.* ¶ 85 (the backlog for essential DRAM production equipment "extends years into the future"); *id.* ¶ 162 (noting that it would take SK hynix the better part of a year to convert a single production line from conventional DRAM to HBM). The constraints Plaintiffs acknowledge in their Complaint explain why Defendants could not quickly pivot capacity back to conventional DRAM.

Finally, there was no guarantee that commodity DRAM margins would stay elevated. Chinese manufacturers continued to exert "competitive pressure" in conventional DRAM segments, eroding margins. *Id.* ¶ 264. The strategy that each Defendant adopted—focusing on high-value HBM while selling conventional DRAM at higher prices—was and is rational and

self-interested. *See, e.g.*, *Jones*, 400 F. Supp. 3d at 920 ("Selling goods at higher prices can be in an entity's best interest—this is but one method companies use to turn a profit.").

*Customer Vetting.* Plaintiffs' allegations that Defendants closely vetted customers during "a shortage," Compl. ¶ 333, also fail to support an inference of conspiracy. It is unremarkable that, amid a widely reported DRAM shortfall, suppliers would independently question customers about end-user identity, order quantities, and the "reality" of reported demand to prevent over-ordering and hoarding. *Id.* ¶ 330. Those allegations are especially implausible in light of U.S. export controls promulgated in October 2022, which placed limits on Defendants' sales to certain customers and would have caused each Defendant to ask customers similar questions about end uses and potential resales to other buyers. *Id.* ¶¶ 92, 213, 298. At bottom, vetting customers to determine whether demand is genuine and sales are legally permissible does not plausibly suggest conspiracy; it is ordinary inventory and compliance management.

*Micron's Exit from Crucial and the Stargate Partnership.* Plaintiffs' attempt to recast Micron's unilateral exit from its Crucial consumer brand as irrational fails for similar reasons. *See id.* ¶¶ 306–29. Once again, Plaintiffs assert that Micron's strategy does not accord with rational conduct "[i]n a competitive market," alleging Micron should have instead expanded its direct-to-consumer business. *Id.* ¶ 326. But once again, the Complaint supplies the independent, sensible economic rationale for Micron's decision: "'The AI-driven growth in the data center,'" Micron explained, "'led to a surge in demand for memory and storage.'" *Id.* ¶ 323. Micron therefore exited Crucial to "'improve supply and support for [its] larger, strategic customers in faster-growing segments.'" *Id.* That decision, as the Complaint acknowledges, has an independent business rationale: reallocating supply toward a higher-value, faster-growing segment with less competition from Chinese firms. *See Jones*, 400 F. Supp. 3d at 920 ("It is just as consistent with innocent behavior as with unlawful behavior that Micron and Hynix would mimic Samsung's actions … It is not unlawful for competitors to mimic the actions of another, especially in such a small market.").

Plaintiffs also overreach in their attempt to connect Micron's discontinuation of Crucial to the separate Stargate announcement involving Samsung and SK hynix. *See id.* ¶¶ 328–29.

Nothing in the Complaint connects those business decisions. Micron was not a party to the Stargate announcement. *Id.* ¶ 304. Ultimately any attempt to connect the two is speculation, not a well-pleaded factual connection. If anything, these allegations show independent, differentiated conduct.

* * *

In short, nothing in the Complaint suggests "individual action [that] would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move." *Musical Instruments*, 798 F.3d at 1195. Rather, the Complaint pleads the very facts and economic conditions that explain Defendants' conduct: a three-firm oligopoly, a severe 2022 downturn, multi-billion-dollar losses, enormous capital costs, multi-year construction timelines, equipment constraints, and an AI-driven demand super-cycle that made supplying HBM significantly more attractive than conventional DRAM. Plaintiffs have not plausibly alleged that Defendants' conduct amounts to the "'extreme action against self-interest' contemplated by [the Ninth] Circuit as a plus factor." *See DRAM II*, 28 F.4th at 50 (quoting *Musical Instruments*, 798 F.3d at 1195).

**(3) Defendants' ordinary business activities do not amount to "opportunities to conspire."**

Defendants' supposed "opportunit[ies] to conspire" consist of routine participation in trade associations, industry conferences, and "customer qualification processes." Compl. ¶ 400. As in *DRAM II*, Plaintiffs never allege Defendants *actually used* these opportunities to conspire. *See* 28 F.4th at 52. For instance, Plaintiffs allege that SEMICON Taiwan 2025 featured a "Memory Executive Summit" at which executives from all three Defendants reportedly "'share[d] the stage.'" Compl. ¶¶ 402, 404. But sharing the stage as part of a panel, common across many industries, does not suggest a conspiracy. Plaintiffs also allege that "[t]he synchronized moves of 2022–2026 each followed identifiable industry gatherings"—without alleging that the companies met about, much less discussed or somehow furthered, the alleged supply shifts at any of these supposed gatherings. *Id.* ¶ 404. As another example, Plaintiffs mention quarterly OEM pricing negotiations and customer qualification processes but likewise never explain how these ordinary business activities served as a vehicle for conspiracy. *Id.* As a result, "the allegations do not

describe any suspected or actual interactions between Defendants at these trade associations—not to mention interactions that suggest the establishment or confirmation of an agreement to unlawfully restrain trade." *Jones*, 400 F. Supp. 3d at 917–18.

Indeed, the Ninth Circuit has held multiple times that "mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." *Musical Instruments*, 798 F.3d at 1196. That includes in *DRAM II*, where the Court rejected the same alleged plus factor because, like here, the plaintiffs did "not allege facts demonstrating that Defendants actually communicated or exchanged information at these trade association meetings, much less that they entered an agreement to coordinate supply decisions while there." 28 F.4th at 52. As the Circuit has held, "trade associations often serve legitimate functions," *id*. (quoting *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999)), and "[i]f we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action." *In re Citric Acid*, 191 F.3d at 1098; *see also Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1270 n.22 (11th Cir. 2019) ("Mere conspiratorial opportunity is routinely and correctly held insufficient to support a conspiracy finding."). Attendance at common industry events, without allegations of conspiratorial communications there, does not plausibly suggest an agreement.

**(4) Defendants' business decisions were not simultaneous.**

Plaintiffs assert that Defendants made simultaneous business decisions, but as discussed above, their actual factual allegations concede that those decisions were "staggered" over months. *See supra* Section IV.A.i.

Plaintiffs assert that Samsung's decision to cut DRAM production in April 2023—more than half a year after Micron and SK hynix—suggests a conspiracy because it departed from a "decades-long counter-cyclical strategy" to "gain market share from smaller peers" by "pursu[ing] market-share gains in downturns." Compl. ¶¶ 7, 238, 356, 358. More fundamentally, Samsung followed a different strategy from its competitors for six months and changed course only after incurring billions of dollars in losses.

The timing of subsequent decisions was neither simultaneous nor suspicious. Conspicuously, Plaintiffs say nothing about the timing of SK hynix's and Micron's production pivots to HBM beyond noting that all Defendants "substantially reallocated production capacity away from commodity DRAM and toward HBM" somewhere over a three-year period from March 2023 to March 2026. *Id.* ¶ 257. That time period is so broad that it covers essentially the entirety of the consumer-facing generative AI era. Regardless, that allegation does not describe lockstep movement consistent with their alleged agreement. Plaintiffs allege Samsung announced it would redirect production toward HBM in Q3 2023, *id.* ¶ 254, whereas SK hynix and Micron allegedly began capturing the groundswell of demand for HBM "[b]y 2024-2025." *Id.* ¶ 256. So, too, for each company's respective exit from legacy DDR3 and DDR4 products: Samsung and SK hynix retired DDR3 production lines by the second half of 2024, while Micron continued to produce it past that time period. And Samsung wound down production of DDR4 in mid-December 2025 while Micron and SK hynix continued into 2026. *Id.* ¶¶ 259–60.

As in *DRAM II*, the picture that emerges is "consistent with Defendants, as competitors in a highly concentrated market, reacting to the same market pressures and taking parallel action to serve their interests." 28 F.4th at 53. Even if these seriatim decisions sufficed to show not only parallel conduct but near-simultaneous actions, the fact that Defendants acted similarly in the face of similar market conditions does not "point[] toward a meeting of the minds." *Twombly*, 550 U.S. at 557; *see DRAM II*, 28 F.4th at 49 (noting that the timing of defendants' actions—when one implemented a business decision that the others implemented in the following quarter—is, if anything, "more indicative of the 'follow the leader' theory than an advance agreement") (citing *Musical Instruments*, 798 F.3d at 1195). Antitrust law does not require companies to ignore the market, and oligopolists "watch each other like hawks." *Jones*, 400 F. Supp. 3d at 919 (quoting *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 875 (7th Cir. 2015)). As this Court has recognized, it is "not at all surpris[ing] that competitors in [the DRAM] market would be poised to make observations about the behavior of other competitors." *Id.*

**(5) Defendants' public financial communications were unilateral, lawful, and unremarkable, not signals to restrain trade.**

As in *DRAM II*, Plaintiffs assert that Defendants publicly signaled to each other to restrict DRAM output and keep prices high. *See* Compl. ¶¶ 335–36. But regular, transparent financial communications do not "tip [] parallel conduct into the realm of the unlawful." *Jones*, 400 F. Supp. 3d at 919. In *DRAM II*, the Ninth Circuit held that similar statements on earnings calls and at investor events were "largely consistent with unilateral conduct in an interdependent market. If no conspiracy existed, Defendants would likely make the same public statements about their observations, predictions, and strategies for the future, particularly in response to investor and analyst questions." 28 F.4th at 50.

The same is true of each of the statements that Plaintiffs carefully excerpted in the Complaint. The statements—public comments on earnings calls or at investor events—"constitute individual Defendants' indications of their own future behavior and descriptions of their past behavior, predictions of industry trends, and observations about competitor behavior." *Jones*, 400 F. Supp. 3d at 918–19 (N.D. Cal. 2019). A public earnings call does not become part of a conspiracy merely because investors and analysts ask questions about topics that may be salient to competitors. *See Jones*, 400 F. Supp. 3d at 920 (noting a "proper[] reluctan[ce]" to characterize "statements concerning business strategies made publicly on earnings call[s] with investors" as evidence of unlawful conspiracies because they communicate "precisely the type of information companies legitimately convey to their shareholders") (citing *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1373 (N.D. Ga. 2017)).

While Plaintiffs focus on Defendants' occasional use of the word "discipline" to describe their respective approaches to supply and capex decision-making, *see* Compl. § V.H, that is no basis upon which to infer conspiracy, as the district court and the Ninth Circuit both concluded in *DRAM II*. *See Jones*, 400 F. Supp. 3d at 919 ("Plaintiffs make much over the sometime use of the word 'discipline' in earnings calls and in presentations before investors. Yet, Defendants' statements amount to no more than descriptions of circumstances of their market."); *DRAM II*, 28 F.4th at 50 ("Plaintiffs allege that Micron's statements in May and June 2017 about the benefits

of exercising ‘capital discipline’ were intended to encourage its competitors to continue restraining production. However, Plaintiffs point to nothing suggesting that Samsung or SK [h]ynix were influenced by Micron’s praise.”). Plaintiffs’ latest excerpts are more of the same.

More important is what the Complaint does not allege. Plaintiffs do not allege any non-public exchange of capacity plans, pricing, output, or product timing. They do not allege any non-public exchanges at all. And unlike the plaintiffs in *DRAM II*, Plaintiffs do not even identify a confidential witness who opined on the purpose of the alleged signals (but, even if they did, under *DRAM II*, that would not necessarily suffice). *See* 2020 WL 8459279, at *6 (rejecting allegation derived from confidential witness that “Samsung ‘leaked’ its intent to increase prices in early 2016” in an effort “to encourage other Defendants to raise prices”).

What was true of the “signals” in *DRAM II* is true of the “signals” here: “neither the context of the statements—earnings calls and investor presentations, where the statements were made in response to direct questions—nor their substance—observations and forecasts of competitors’ actions and affirmance of own actions—suggest conspiracy because they equally demonstrate interdependence.” *Id.*

**(6) The structure of the alleged DRAM market is a neutral fact, not a plus factor.**

Plaintiffs’ next assertion—that “[t]he conventional DRAM market possesses every structural feature that facilitates coordinated behavior,” Compl. ¶ 399—again “restates that [the] market is interdependent.” *Musical Instruments*, 798 F.3d at 1195. Plaintiffs omit the implication of the DRAM market structure: conscious parallelism, which is “‘endemic to an oligopoly.’” *Jones*, 400 F. Supp. 3d at 922 (quoting *Prosterman*, 747 F. App’x at 461–62). Concentration suggests conspiracy only when other plausible plus factors accompany it. Standing alone (as it does here), it merely makes consciously parallel behavior more likely, because oligopolists are “cognizant of—and reacting to—similar market pressures.” *Musical Instruments*, 798 F.3d at 1193; *see Jones*, 400 F. Supp. 3d at 917 (“[A]s the number of firms in a market declines, it also becomes increasingly likely that lawful conscious parallel behavior or interdependent pricing (following each other’s pricing decisions) will occur without prior agreement.”). “Allegations

concerning the features of the market and its structure are therefore neutral facts," *Jones*, 400 F. Supp. 3d at 917, that fail to "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible." *DRAM II*, 28 F.4th at 47 (quoting *Twombly*, 550 U.S. at 570).

Moreover, market-share data that Plaintiffs included in the Complaint make their conspiracy theory even more implausible. When the Ninth Circuit decided *DRAM II* in 2022, Samsung held approximately half of the global DRAM market, with SK hynix and Micron each accounting for approximately a quarter. *See* Compl. Fig. 2. By Q3 2025, Plaintiffs allege, those shares had shifted materially: SK hynix overtook Samsung and led at 33.2%, Samsung had fallen to 32.6%, and Micron held 25.7%. *See id.* ¶¶ 72, 200. Samsung's alleged loss of nearly 20 percentage points of market share, in large part to SK hynix, undermines Plaintiffs' theory of coordination. *See Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1318 (11th Cir. 2003) (finding that significant market share shifts during the period of alleged collusion "strongly undermine[] … conspiracy allegations" and are "plainly [] inconsistent with a price fixing conspiracy"); *In re Citric Acid Litig.*, 191 F.3d at 1102–03 ("Cargill's success in gaining 22 percent of the United States market share by 1995, which came largely at the expense of [competitor-defendants]" undercut plus factor assertion and supported the conclusion that "the evidence does not tend to exclude the possibility that Cargill acted legally in its pricing decisions.").

**(7) Decades-old antitrust litigation and *DRAM II*, which was dismissed at the pleading stage, do not support a plausible inference of conspiracy.**

Defendants' prior antitrust matters, some more than twenty years old, did not make the allegations in *DRAM II* plausible and do not help Plaintiffs here. *See* Compl. ¶¶ 390–96. Historical evidence generally does not support an inference of conspiracy. *See, e.g.*, HOVENKAMP, ANTITRUST LAW ¶ 1421a, at 125 ("Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy."). At a minimum, a plaintiff must link the past conduct to the conduct at issue to plausibly plead this plus factor. *See, e.g.*, *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1258 (W.D. Wash. 2009) (rejecting

past criminal conduct as plus factor because plaintiffs failed to allege a link between geographic markets and individuals involved). Plaintiffs have not done so here.

*DRAM II* cannot fill the gap. The district court in *DRAM II* dismissed that lawsuit with prejudice at the pleading stage, and the Ninth Circuit affirmed. 28 F.4th at 54. The existence of a prior lawsuit dismissed at the pleading stage does not strengthen Plaintiffs' current conspiracy allegations. As for the 1998–2002 criminal case, although Plaintiffs allege that the cartel involved "the exact same product market," Compl. ¶ 390, and that each Defendant (or its predecessor, in the case of SK hynix) participated, *see id.*, they do not allege any factual link between the decades-old conduct and the present allegations. Plaintiffs' allegations regarding European Commission fines, *see id.* ¶ 394, and the Chinese SAMR investigation (for which Plaintiffs do not and cannot allege that any violation was found), *see id.* ¶ 396, fare no better. *Cf. Jones*, 400 F. Supp. 3d at 921 (addressing and rejecting allegations describing SAMR investigation, in part because "foreign laws may prohibit behavior that is lawful under § 1").

As the Ninth Circuit held in *DRAM II*, courts may consider prior criminal history, but without other compelling circumstantial evidence—which is absent here—historic behavior does not support a plausible inference of conspiracy. *See* 28 F.4th at 54 ("Plaintiffs' allegations of parallel conduct that could just as well be independent action, combined with Defendants' criminal history from twenty years ago, do not provide a context suggesting unlawful agreement."); *see also* 2020 WL 8459279, at *10 ("Moreover, the Court notes that the prior lawsuits appear to have occurred when the DRAM market was significantly more competitive, which would have rendered an express agreement more useful and necessary to maintain uniform behavior compared to a concentrated market."). This last "plus factor" therefore fails with the rest.

### B. Plaintiffs' State-Law Claims Should Be Dismissed.

The Court should dismiss all of Plaintiffs' state-law claims, which rise and fall with their federal Sherman Act claim. First, Counts II, IV, V, and VI—which assert parallel antitrust claims under California, Minnesota, New York, and Wisconsin law—fail for the same reasons as the Sherman Act claim. As the Ninth Circuit held, "Plaintiffs' claims brought under California's

Cartwright Act, Unfair Competition Law, and the antitrust laws of five other states are all premised upon the existence of an antitrust conspiracy, and therefore rise and fall with the Sherman Act claim." *DRAM II*, 28 F.4th at 54 n.7. This same principle applies to Plaintiffs' claims under New York, Minnesota, and Wisconsin antitrust law as well. *See, e.g.*, *Insulate SB, Inc. v. Adv. Finishing Sys., Inc.*, 797 F.3d 538, 547 (8th Cir. 2015) ("Because 'Minnesota antitrust law is generally interpreted consistently with federal antitrust law,' … [plaintiff's] Minnesota antitrust claim also must be dismissed for failure to state a claim." (quoting *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007))); *Univ. Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *10 (N.D. Cal. Jan. 9, 2012) ("Plaintiffs' claim under the [New York] Donnelly Act … is derivative of plaintiffs' Sherman Act claims and therefore 'succeed[s] or fail[s] with its Sherman Act claims.'" (quoting *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 577 (S.D.N.Y. 2007))); *State v. Waste Mgmt. of Wis., Inc*., 81 Wis.2d 555, 574 (Wis. 1978) ("[W]hat amounts to a conspiracy in restraint of trade under the Sherman Act amounts to a conspiracy in restraint of trade under the Wisconsin antitrust act.").

Second, Count III, which Plaintiffs bring under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq*. (2026), cannot stand on its own either. Where, as here, a plaintiff pleads the same allegations supporting a FDUTPA claim and an antitrust claim and fails to plausibly plead the antitrust claim, the Court should conclude that the plaintiff has not stated a FDUTPA claim. *See, e.g.*, *QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012). The Court should dismiss Count III as well.

## V. CONCLUSION

The Complaint fails to allege direct evidence of agreement, sufficient facts indicating that Defendants acted in parallel, or any "plus factors" that could support a plausible inference of conspiracy. As the Ninth Circuit held in *DRAM II*, "the totality of Plaintiffs' allegations does not suggest anything more than conscious parallelism," and Defendants' actions are "'more likely explained by lawful, unchoreographed free-market behavior' in a concentrated industry." 28 F.4th at 53–54 (quoting *Iqbal,* 556 U.S. at 680). Because that is at least equally true here, the Court should dismiss the Complaint.

Dated: September 2, 2026

Respectfully submitted,

By: */s/ Heather S. Nyong'o*

HEATHER S. NYONG'O (S.B. #222202)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California Street, Suite 2400
San Francisco, CA 94108
Telephone: (415) 796-4480
hnyongo@cgsh.com

BRIAN BYRNE (S.B. #181362)
YE EUN (CHARLOTTE) CHUN (S.B. #331459)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
151 University Avenue
Palo Alto, CA 94301
Telephone: (650) 815-4110
bbyrne@cgsh.com
chchun@cgsh.com

STEVEN J. KAISER*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1554
skaiser@cgsh.com
*Admitted *Pro Hac Vice*

*Counsel for Defendants SK hynix Inc. and SK hynix America Inc.*

By: */s/ Diana A. Aguilar Aldape*

DIANA A. AGUILAR ALDAPE (S.B. #304427)
SARA N. PAHLAVAN (S.B. #332945)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: (415) 984-8700
daguilar@omm.com
spahlavan@omm.com

IAN SIMMONS*
BRIAN P. QUINN*
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
isimmons@omm.com
bquinn@omm.com
*Admitted Pro Hac Vice

*Counsel for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*

By: */s/ Rachel S. Brass*

RACHEL S. BRASS (S.B. # 219301)
JULIAN KLEINBRODT (S.B. # 302085)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8293
rbrass@gibsondunn.com
jkleinbrodt@gibsondunn.com

BLAINE H. EVANSON (S.B. # 254338)
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone: (949) 451-3805
bevanson@gibsondunn.com

*Counsel for Defendant Micron Technology, Inc.*

## ATTESTATION OF CONCURRENCE IN FILING

Pursuant to Local Rule 5-1(i)(3), I attest that the signatories listed, on whose behalf the filing is submitted, concur in the filing's content and have authorized the e-filing of this document.

Dated: September 2, 2026

Respectfully submitted,

By: */s/ Heather S. Nyong'o*

Heather S. Nyong'o

*Counsel for Defendants SK hynix Inc. and SK hynix America Inc.*