**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

Priscilla Ghita (CA 368190)
pghita@bathaeedunne.com
3420 Bristol Street, Suite 600
Costa Mesa, CA 92626

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARC GARCIAGUIRRE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., et al.,<br><br>Defendants. | Case No. 5:26-cv-06345-NW<br><br>Hon. Noël Wise<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CLASS ACTION COMPLAINT**<br><br>Date: October 21, 2026<br>Time: 9:00 a.m.<br>Place: Courtroom 3, 5th Floor |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1
BACKGROUND ........................................................................................................2
A. DRAM and How It Is Made and Sold ........................................................2
B. The Conventional DRAM Market and the Fabrication Barrier to Entry .....3
C. The 1998-2002 Conspiracy and the 2016-2018 Price Increase ...................4
D. The Production Cuts of October 2022 Through April 2023 ........................5
E. The Continuation of the Cuts and the Shift of Capacity to HBM, 2023-2024 ........................................................................................5
F. The DDR3 and DDR4 Wind-Downs, 2024-2025........................................6
G. Defendants' Withdrawal of CDM Capacity as Prices Reached Record Highs ........................................................................................7
H. The Long-Term Commitment of Supply to AI Customers and the Refusal of Long-Term Conventional Contracts..........................................8
I. Micron's Shutdown of Its Crucial Consumer Business ...............................9
J. The Nearly Eightfold Increase in Conventional DRAM Prices...................9
K. Procedural History .....................................................................................10
LEGAL STANDARD................................................................................................10
ARGUMENT............................................................................................................11
I. The CAC Plausibly Alleges an Agreement to Restrict the Supply of Conventional DRAM ...........................................................................11
A. The CAC Pleads Parallel Conduct ...........................................................12
B. The CAC Pleads Eleven Plus Factors That Suggest a Preceding Agreement ..................................................................................13
C. Viewed Together, the Plus Factors Plausibly Suggest a Preceding Agreement ..................................................................................22
D. *DRAM II* Is Distinguishable ..................................................................23
II. Conditional Request For Leave To Amend ..................................................24
CONCLUSION.........................................................................................................24

## TABLE OF AUTHORITIES

### Cases

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... *passim*

*City of Long Beach v. Standard Oil Co.*,
872 F.2d 1401 (9th Cir. 1989) .......... 22

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) .......... 22, 23

*Covad Communications Co. v. Bell Atlantic Corp.*,
398 F.3d 666 (D.C. Cir. 2005) .......... 14

*Esco Corp. v. United States*,
340 F.2d 1000 (9th Cir. 1965) .......... 20

*Flextronics International USA, Inc. v. Panasonic Holdings Corp.*,
2023 WL 4677017 (9th Cir. July 21, 2023) .......... 12, 21, 22

*Harkins Amusement Enterprises, Inc. v. General Cinema Corp.*,
850 F.2d 477 (9th Cir. 1988) .......... 18

*Hospital Building Co. v. Trustees of Rex Hospital*,
425 U.S. 738 (1976) .......... 10-11

*In re California Bail Bond Antitrust Litigation*,
2022 WL 19975276 (N.D. Cal. Nov. 7, 2022) .......... 14

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*,
906 F.2d 432 (9th Cir. 1990) .......... 16, 20

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation*,
28 F.4th 42 (9th Cir. 2022) .......... *passim*

*In re Flash Memory Antitrust Litigation*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) .......... 22

*In re Fresh & Process Potatoes Antitrust Litigation*,
2012 WL 3067580 (D. Idaho July 27, 2012) .......... 14

*In re Graphics Processing Units Antitrust Litigation*,
540 F. Supp. 2d 1085 (N.D. Cal. 2007) .......... 20

*In re Musical Instruments & Equipment Antitrust Litigation*,
798 F.3d 1186 (9th Cir. 2015) .......... *passim*

*In re National Football League's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136 (9th Cir. 2019) ....................22, 23

*In re Text Messaging Antitrust Litigation*, 630 F.3d 622 (7th Cir. 2010) ....................19

*In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ....................21

*Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939)....................12

*Jones v. Micron Technology Inc.*, 400 F. Supp. 3d 897 (N.D. Cal. 2019) .................... 12-13

*Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984)....................11

*Movie 1 & 2 v. United Artists Communications, Inc.*, 909 F.2d 1245 (9th Cir. 1990) .................... 17-18

*National Collegiate Athletic Association v. Board of Regents of the University of Okla.*, 468 U.S. 85 (1984)....................11

*PLS.com, LLC v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022) ....................10

*SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110 (9th Cir. 2022) ....................11

*Solyndra Residual Trust ex rel. Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027 (N.D. Cal. 2014) ....................21

*Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485 (5th Cir. 1982) ....................18

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ....................11

*Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010)....................13

*Teva Pharmaceuticals USA, Inc. v. Corcept Therapeutics, Inc.*, 2025 WL 2637507 (N.D. Cal. Sept. 12, 2025) .................... 10, 22-23

**Statutes**

15 U.S.C. § 1....................10, 11

**Rules**

FED. R. CIV. P. 12(b)(6) ..........................................................................................................10, 11

## INTRODUCTION

Defendants Samsung, SK hynix, and Micron dominate the market for conventional dynamic random-access memory ("DRAM"), the standardized working memory inside nearly all personal computers, smartphones, and servers. Since late 2022, these firms—which together supply roughly ninety percent of conventional DRAM worldwide—have conspired to restrict supply and inflate prices, peaking with a near eightfold increase in conventional DRAM prices in one eighteen-month period. They have done this before, including as part of a criminal conspiracy that led to convictions of Samsung and Hynix (now SK hynix) and of executives from Samsung and Micron.

As the Class Action Complaint ("CAC," Dkt. No. 1) explains, all three Defendants cut production of conventional DRAM beginning in late 2022, then colluded to restrict production for years after the stated reason for the cuts had long disappeared. Prices doubled, then doubled, then doubled again. In a competitive market—indeed, even in an oligopoly whose members were acting independently—prices like that would have drawn supply back. Defendants instead took apart their own capacity to provide it. They moved scarce wafers to a different product that by their own executives' admissions now earns lower margins. They announced, within three months of one another, the retirement of a fully depreciated product line whose price was climbing. Micron shut down Crucial, a profitable twenty-nine-year-old consumer business, just as consumer prices peaked. Samsung and SK hynix locked up supply for AI customers years in advance while refusing the multiyear contracts their conventional customers were asking for. All the while, Defendants told investors—and each other—that they would hold their market shares steady and would not expand. Each of these choices would have cost the company that made it money unless its two rivals made the same choice. Each rival did, every time, for more than three years.

Defendants now ask this Court to dismiss the CAC as a rerun of *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation*, 28 F.4th 42 (9th Cir. 2022) ("*DRAM II*"). Defendants are wrong. *DRAM II* involved a market leader that trimmed its rate of growth, two smaller rivals that followed a quarter later, a profit sacrifice measured in the tens of millions of dollars, and a supply restraint that dissolved within two years. Here the smaller firms cut first, and the market leader—reversing years of practice—announced its own cuts two months later. Here, the profit

sacrifice from not expanding into runaway DRAM prices runs to the hundreds of millions (perhaps billions) of dollars per year. And here, the firms' coordinated supply restraints shuttered businesses and retired product lines that cannot be restored, and they have held for three-plus years, through a 697 percent price increase, without a single defection.

The CAC pleads parallel conduct and eleven plus factors that together strongly imply Defendants' conduct was the result of an agreement. Defendants' motion offers excuses for each factor in isolation, the plausibility of which falls apart when considering all the plus factors as a whole. Put simply, the facts in the CAC do not render merely plausible that the Defendants cut conventional DRAM supply as part of an agreement, but forcefully suggest—even compel—the inference that they have done so. The case law does not demand this standard, but the remarkable behavior by the Defendants pleaded in the CAC (and its equally remarkable impact on consumers) meets it.

The CAC plausibly alleges that Defendants agreed to restrict the supply of conventional DRAM, in violation of federal and state antitrust laws. Defendants' motion should be denied.

## BACKGROUND

### A. DRAM and How It Is Made and Sold

DRAM is a semiconductor chip that provides temporary, high-speed data storage for electronic processors. CAC ¶ 52. Unlike persistent storage devices like NAND flash or hard drives, DRAM only stores information while a computing device is powered on, but while such a device is on, DRAM is crucial to its operation. *Id.* ¶¶ 53-56. The amount of DRAM in a system determines how many applications can run simultaneously, how large a dataset can be processed in memory, and how responsive a system feels to a user. *Id.* ¶ 56. In the memory hierarchy of a modern computer, DRAM sits between small, faster processor caches (usually composed of static random-access memory, or SRAM) and long-term storage (*e.g.*, solid-state memory or hard disk), and is used as "main memory" for the bulk of longer-lasting compute processes in everything from smartphones, to personal computers, to data center servers. *Id.* ¶¶ 54-55, 57, 143-45. Without DRAM, which is about 100,000 times faster than a solid-state drive and about 100 times slower than the SRAM used for on-chip cache, no modern computing device can operate. *Id.* ¶¶ 55, 57. There is no substitute. *Id.* ¶¶ 57, 76, 145.

DRAM is also a commodity, with chips built to specifications set by an industry standards body, JEDEC. CAC ¶¶ 58-60. One manufacturer's DRAM works exactly like another's built to the same standard, making DRAM generally fungible from the perspective of buyers. *Id.* The CAC refers to this standardized memory as conventional or commodity DRAM. *Id.* ¶¶ 59-60, 116-18. DRAM is denoted by generation number, with each generation faster than the last. *Id.* ¶¶ 58-59, 116-18, 146, 172-79, 270. The current mainstream generation is DDR5, which is used in most new PCs and smartphones, though DDR4 remains in wide use. *Id.* ¶¶ 59, 68-69, 261.

Another type of DRAM, called high-bandwidth memory ("HBM"), stacks memory dies for use in AI accelerators. CAC ¶¶ 59-60. HBM cannot be used in PCs, smartphones, or ordinary servers, but it is made from the same silicon wafers in the same fabrication plants. *Id.* ¶¶ 59-60, 116-79, 191-93. Every wafer that goes to HBM is a wafer that does not become conventional DRAM, and HBM requires greater wafer space for the same amount of storage. *Id.* ¶¶ 65, 140-54, 251-53. As a Micron executive put it, "[a]s we increase HBM supply, it leaves less memory left over for the non-HBM portion of the market, because of this three-to-one basis." *Id.* ¶ 373. Any shift toward HBM thus withdraws a disproportionate share of conventional DRAM supply. *Id.* ¶¶ 65, 251-53.

**B. The Conventional DRAM Market and the Fabrication Barrier to Entry**

The relevant market is the Conventional DRAM Market ("CDM"). CAC ¶¶ 116-209. DRAM is not fungible with other memory—flash memory (used for persistent storage) is roughly a thousand times slower, and the SRAM used in processor caches costs thirty to a hundred times as much per bit. *Id.* ¶¶ 140-55. HBM is also not in the CDM. *Id.* ¶¶ 116-18, 132-39, 147-54, 160-65, 171, 177-79. HBM cannot be installed in PCs, smartphones, or other consumer devices, but is sold exclusively for use in AI accelerators and other high-performance computing systems. *Id.* ¶¶ 118, 147-54, 171.

Defendants make nearly all of the world's DRAM, selling to computer makers, data center operators, and module makers under contracts renegotiated every quarter. CAC ¶¶ 66, 72-77, 198, 200-09. TrendForce, the industry's leading research firm, tracks and publishes these contract prices, which gives the Defendants near-real-time visibility into their competitors' pricing. *Id.* ¶¶ 66, 125. Additionally, for twenty-nine years Micron sold DRAM directly to consumers through its Crucial business, which it recently shuttered as part of the conspiracy set forth in the CAC. *Id.* ¶¶ 306-29. In

the third quarter of 2025, SK hynix had 33.2 percent of global DRAM revenue share, Samsung 32.6 percent, and Micron 25.7 percent. *Id.* ¶ 200. Together they have held more than 90 percent of the market in every quarter since 2013. *Id.* ¶ 207. Although most reported figures include HBM revenue shares, market share excluding HBM is largely the same, estimated at 88.5 percent among all three Defendants. *Id.* ¶¶ 206, 208. The Herfindahl-Hirschman Index for the CDM is approximately 2,801-2,868, well above the 1,800 threshold federal antitrust agencies define as "highly concentrated." *Id.* ¶¶ 203, 209. The rest of the market belongs to a few small specialty producers and to two Chinese companies that United States export controls limit to older generations of DRAM. *Id.* ¶ 74.

The CDM is protected by a powerful barrier to entry that arises from the difficulty of fabricating DRAM chips: the Fabrication Barrier to Entry ("FBE"). CAC ¶¶ 78-114. A single DRAM fabrication facility ("fab") costs $15 to $20 billion, takes three to five years to bring online, requires specialized lithography machines from a single supplier already output-committed years in advance, and uses manufacturing trade secrets that cannot be purchased or licensed. *Id.* ¶¶ 63, 85-87, 90. Roughly twenty companies made DRAM in the 1990s, but today only three of significance remain—the Defendants, which together control over 91 percent of the CDM by revenue. *Id.* ¶¶ 73, 102. The last decade has not seen a single significant CDM entrant. *Id.* ¶ 75. When the three Defendants restrict supply, there is no market mechanism to restore competitive pricing. *Id.* ¶ 110.

### C. The 1998-2002 Conspiracy and the 2016-2018 Price Increase

Defendants have a history of fixing DRAM prices. From approximately July 1998 to June 2002, Samsung, Hynix (now SK hynix), Micron, and two other manufacturers ran a criminal cartel that fixed the price of DRAM sold to the largest American computer makers. CAC ¶¶ 216-25. They met and called one another to agree on prices, and traded sales data to monitor and enforce their agreement. *Id.* ¶ 217. Hynix and Samsung pleaded guilty in May 2005 and October 2005, respectively, paying fines of $185 million (Hynix) and $300 million (Samsung). *Id.* ¶ 218. Five Samsung executives went to prison—and at least one of them was promoted after his release, eventually running Samsung Europe. *Id.* ¶¶ 220-21, 224-25. Micron participated in the cartel but received conditional immunity for cooperating as a whistleblower, though a Micron executive was convicted of obstruction of justice. *Id.* ¶ 223.

Prices spiked again between 2016 and 2018, when the average selling price of DRAM rose 165 percent. CAC ¶ 226. Purchasers sued the same three companies in this District in April 2018, and that case failed. *Id.* ¶¶ 228, 230. As the CAC explains, the 2018 case alleged only parallel pricing without identifying unlawful coordinated conduct as set forth here. *Id.* ¶ 230.

**D. The Production Cuts of October 2022 Through April 2023**

Defendants' challenged conduct began in late 2022 amidst a downturn in the CDM. CAC ¶¶ 7, 233-50. On September 29, 2022, before any Defendant had announced a cut, Micron told investors that it would ramp output only "in line with industry demand growth, which is consistent with our goal to maintain stable bit supply share as well as supply discipline." *Id.* ¶ 341. Micron made the same promise again in December 2023, June 2024, September 2024, and March 2026. *Id.* ¶ 342. On October 26, 2022, SK hynix announced that it would cut its 2023 capital spending by more than half and reduce wafer production, telling its investors that "memory suppliers have begun taking actions, such as cutting back on CapEx and adjusting utilization rates." *Id.* ¶¶ 235, 337. Micron followed three weeks later, on November 16, 2022, with a cut of approximately 20 percent in its wafer starts, which it deepened to 25 percent in the following months. *Id.* ¶¶ 236, 239.

Samsung, the lowest-cost producer, had historically maintained production levels during downturns, including those of 2008-2009 and 2019, even as its rivals cut back or failed. CAC ¶¶ 358-60. As of January 2023, analysts expected it to use the latest downturn "to gain market share from smaller peers." *Id.* ¶ 238. Although in late January 2023 Samsung announced that "there will be no artificial production cut in its memory semiconductor production," *id.* ¶ 360, it reversed itself two months later, *id.* ¶ 361. On April 7, 2023, Samsung said it was "lowering the production of memory chips by a meaningful level," a move the press called an "unusual output cut" with "no previous announcement recalled by Samsung officials and analysts." *Id.* ¶¶ 240, 242. The Defendants did not compete for one another's customers; rather, all three pulled back together. *Id.* ¶ 7.

**E. The Continuation of the Cuts and the Shift of Capacity to HBM, 2023-2024**

Defendants publicly stated, beginning with Micron's announcement on November 16, 2022, that their cuts were meant to sell off excess inventory. CAC ¶ 246. Samsung told investors in its third-quarter 2023 earnings release that it was reducing inventory "by production adjustment rather than

by aggressive sales expansion." *Id.* ¶¶ 254, 340. By September 2023, an industry expansion planned at roughly 14 percent, *id.* ¶ 287, had become an industrywide contraction, *id.* ¶ 288.

Excess inventory was largely gone by January 2024, with Samsung reporting accelerated depletion of DRAM inventory. CAC ¶ 247. Defendants' cuts nonetheless remained in force through normalization and tightening in 2024 and depletion in 2025. *Id.* ¶ 250. In addition, beginning in 2023, all three Defendants simultaneously redirected a significant portion of manufacturing capacity and capital expenditure from commodity DRAM to HBM. *Id.* ¶¶ 251-58. Because of the three-to-one wafer tradeoff, the move cost the CDM far more supply than it produced in HBM. *Id.* ¶¶ 252-53, 372-75. TrendForce estimated that by the end of 2025 HBM would consume 18 percent of Defendants' wafers and yield 8 percent of their bits. *Id.* ¶ 291. Because all three Defendants shifted capacity to HBM together, the effect on the market was the same as a production quota. *Id.* ¶ 258.

By late 2024, CDM prices were climbing. CAC ¶ 384. On November 15, 2024, Samsung launched a KRW 10 trillion stock buyback, and on November 27, 2024, SK hynix raised its dividend and adopted a policy it called "Capex Discipline," which caps annual investment at about 35% of revenue. *Id.* ¶¶ 384-85. In the highly concentrated CDM, SK hynix's public cap on investment was a standing assurance to Samsung and Micron that it would not expand to take their share. *Id.* ¶ 386.

**F. The DDR3 and DDR4 Wind-Downs, 2024-2025**

Amidst the simultaneous pivot away from conventional DRAM and towards HBM production, Defendants retired older products that were still used in PCs, servers, and embedded systems. CAC ¶¶ 251-71. Samsung and SK hynix shut down their DDR3 lines in 2024. *Id.* ¶ 259. Then, between approximately April and June 2025, all three Defendants announced they would wind down mainstream DDR4, with final shipments between December 2025 and April 2026. *Id.* ¶ 260. DDR4 was still in wide use, and Samsung was producing DDR4 on fully depreciated lines of production that were "inexpensive to keep running." *Id.* ¶¶ 261, 270. The announcements set off panic buying, and by August 2025 a DDR4 chip cost more ($9.17) than the newer DDR5 model ($5.99). *Id.* ¶¶ 261-63, 267-70. Although companies independently retiring products would be expected to do so at different times, reflecting differences in product mix, customer commitments, and manufacturing capabilities, all three Defendants did so within 2-3 months of each other. *Id.* ¶ 271.

### G. Defendants' Withdrawal of CDM Capacity as Prices Reached Record Highs

By the third quarter of 2025, conventional DRAM contract prices had increased 171.8 percent in a single year—and continued to rise. CAC ¶ 272. In commodity markets, rapid price increases tend to draw new supply into the market, including from incumbents—yet in the CDM no such supply materialized. *Id.* ¶¶ 9, 416. To the contrary, Defendants systematically scuttled their capacity to increase supply. *Id.* ¶¶ 272-302. Micron held its wafer starts "significantly below 2022 levels" under what it called a "structural reduction in capacity." *Id.* ¶ 289. Between March 2023 and March 2026, all three Defendants continued to devote limited wafer space to HBM, where each wafer yields a third as many bits. *Id.* ¶¶ 251-58, 372-75. In February 2024, Samsung halted construction at one new plant and delayed another, and Micron let its New York fab, announced on October 4, 2022, slip from a planned ramp in "the latter half of the decade" to a January 2026 groundbreaking and a projected opening in late 2030. *Id.* ¶¶ 292, 294. By March 2024, Samsung and SK hynix had even stopped reselling their used DRAM equipment, which smaller producers had relied on to build capacity of their own. *Id.* ¶¶ 100-01, 298. The $61.3 billion in total DRAM-sector capital spending projected for 2026 was to be devoted to HBM and process upgrades and was, as TrendForce observed in late 2025, "unlikely to significantly affect bit output." *Id.* ¶ 277. The forgone expansion would not have required new fabs, as moving existing lines to a newer process could yield 70 percent more bits per wafer. *Id.* ¶ 290. And in the past, Defendants had moved quickly to expand production when it suited them, including with respect to HBM. *Id.* ¶¶ 283-284. But all three did not do so for conventional DRAM. *Id.* ¶ 284.

Indeed, Defendants actively destroyed their capacity for expansion just as conventional DRAM became more profitable than HBM to produce. CAC ¶¶ 377-82. Margins were unprecedentedly high for DRAM, with Micron reporting for its Q2 2026 a 76 percent operating margin in the business unit that sells its conventional consumer memory. *Id.* ¶¶ 17, 370-71. At that margin, each additional 1 percent of in-unit sales would be worth roughly $234 million a year in operating income to Micron alone, with an additional 20 percent worth roughly $4.69 billion. *Id.* ¶ 371. Moreover, choosing HBM over DRAM meant forgoing significant profits, as each bit of HBM produced sacrifices three bits of conventional DRAM. *Id.* ¶¶ 372-75. Thus, allocation of wafer space

to HBM makes sense only if the profit from one HBM bit exceeds the profit from three conventional DRAM bits sold into the shortage. *Id.* ¶ 374. As the CAC explains based on an analysis of this dynamic, the allocation to HBM would require a revenue premium per bit of roughly 2.5 to 3.8 times that of DRAM to justify the allocation. *Id.* ¶¶ 374-75.

As Defendants have publicly stated, there is no such premium. Samsung told investors on its Q2 2025 earnings call that the margin gap between HBM and conventional DRAM was "expected to narrow sharply." CAC ¶ 376. Micron's CEO has said "non-HBM margins are currently higher than HBM." *Id.* ¶ 380. SK hynix has stated that standard memory margins are 80 percent compared to roughly 60 percent for HBM. *Id.* ¶ 381. TrendForce's own per-wafer analysis, published on June 2, 2026, and based on die size, yield, and pricing, found that a conventional DDR5 module overtook HBM in revenue per wafer in the first quarter of 2026 and that HBM's profitability fell below that DDR5 module's as well. *Id.* ¶ 377. Smaller CDM producers maintained production at full load and approved record capital spending. *Id.* ¶ 299. All three Defendants, however, restricted their CDM supply, a decision irreconcilable with independent profit maximization. *Id.* ¶ 382.

### H. The Long-Term Commitment of Supply to AI Customers and the Refusal of Long-Term Conventional Contracts

While conventional DRAM ran in short supply, Defendants committed their capacity to AI customers years in advance. CAC ¶¶ 256, 303. By 2024-2025, SK hynix had sold out its HBM production, with its memory capacity booked through 2026, and Micron had presold substantially all of its HBM output through 2026. *Id.* ¶ 256. On October 1, 2025, OpenAI announced that Samsung and SK hynix would supply its Stargate data center project, reportedly under preliminary agreements for up to 900,000 wafers a month. *Id.* ¶¶ 303-05, 404. If fully implemented, that commitment would reserve roughly 40 percent of the world's DRAM output for a single customer. *Id.* ¶ 303.

CDM customers received the opposite treatment. On January 6, 2026, TrendForce reported that Samsung and SK hynix were turning down the two- and three-year contracts that their largest server customers sought and were "sticking to quarterly contracts, anticipating stepwise DRAM price increases each quarter through 2027," *id.* ¶ 414, conduct which made economic sense only if each was confident the other would not undercut it, *id.* ¶ 415. The same month, the industry press reported

that all three Defendants had begun questioning customers about their orders. *Id.* ¶ 330-34. "The three companies became stricter," one customer said, "and asked us about who we will supply to, how much quantity, and if the demand of our customers are real." *Id.* ¶ 331. This practice bears a direct resemblance to the monitoring mechanisms of the 1998-2002 cartel. *Id.* ¶ 334.

**I. Micron's Shutdown of Its Crucial Consumer Business**

Micron was the only Defendant that sold DRAM directly to consumers. CAC ¶¶ 308, 326. It had done so since 1996 through Crucial, which "became the first company to sell memory directly to the consumer" and grew into one of the most recognized retail memory brands in the world. *Id.* ¶¶ 307, 309. Crucial sold more than 250,000 memory upgrades through Amazon, Best Buy, Newegg, and other major retailers. *Id.* ¶¶ 312, 316. Micron itself called the brand "synonymous with technical leadership, quality and reliability." *Id.* ¶ 323. Micron does not report Crucial's results separately, but the business unit that included Crucial reported $11.86 billion in revenue in fiscal 2025 and a 76 percent operating margin by early 2026. *Id.* ¶ 321. Then in late 2025, in the midst of the highest CDM prices in memory, Micron decided it would scuttle Crucial entirely. *Id.* ¶¶ 302-29.

On December 3, 2025, Micron announced it would shut Crucial down by the end of February 2026. CAC ¶ 322. At that time, consumer memory prices were up 100 to 500 percent year-over-year, and the announcement came within weeks of the Stargate announcements that did not include Micron. *Id.* ¶¶ 304, 325, 328. Micron said it was exiting "in order to improve supply and support for our larger, strategic customers in faster-growing segments." *Id.* ¶ 323. Micron scuttled its 29-year-old consumer business as consumer prices were at record highs and its two rivals had no consumer channel with which to take the customers Micron had abandoned. *Id.* ¶¶ 326-27. A profit-maximizing company would have used such a channel to sell conventional DRAM into record prices. *Id.* ¶ 306.

**J. The Nearly Eightfold Increase in Conventional DRAM Prices**

Contract prices for conventional DRAM rose 171.8 percent in the year ending Q3 2025, another 50% in Q4 2025, and another 93-98% in Q1 2026, for a compounded increase of 697% in 18 months. CAC ¶¶ 8, 272. In February 2026, Micron itself called this the "most severe memory supply shortage in more than 40 years." *Id.* ¶ 281. A 64 GB memory kit that sold for about $189 in March 2025 cost roughly $1,080 a year later. *Id.* ¶ 272. Micron's quarterly DRAM revenue meanwhile grew

from approximately $2.7 billion in Q1 2023 to $18.8 billion in Q2 2026, while SK hynix's quarterly memory revenue rose from KRW 12.43 trillion to KRW 52.58 trillion and Samsung's memory-division revenue rose from KRW 17.49 trillion to KRW 74.8 trillion between Q1 2024 and Q1 2026. *Id.* ¶¶ 408-10. And in Q2 2026, the memory businesses of Samsung and SK hynix reported operating margins above 70 percent. *Id.*

### K. Procedural History

Plaintiffs—seventeen consumers and small businesses from five states who purchased conventional DRAM at prices inflated by Defendants' conspiracy, CAC ¶¶ 20-36—filed the CAC on June 25, 2026. Count I alleges that, since approximately October 2022, Defendants have "maintained a continuing agreement, combination, or conspiracy in restraint of trade in the market for conventional DRAM, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1," and it seeks injunctive relief on behalf of a nationwide class. *Id.* ¶¶ 481-82. Counts II through VI seek damages for state classes under the antitrust or consumer protection statutes of California, Florida, Minnesota, New York, and Wisconsin. *Id.* ¶¶ 493, 503, 519, 531, 542. Defendants jointly moved to dismiss under Rule 12(b)(6) on September 2, 2026 (Dkt. No. 58, "Motion" or "Mot."), arguing the CAC pleads no direct evidence of an agreement and that each Defendant's conduct was independently rational. Mot. 1, 8, 10-17.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 831 (9th Cir. 2022) (cleaned up) (reversing dismissal of Sherman Act and Cartwright Act claims). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts do not weigh facts at the Rule 12(b)(6) stage. *See Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 2025 WL 2637507, at *10 (N.D. Cal. Sept. 12, 2025) ("the Court's skepticism, particularly when [the plaintiff] has not had the benefit of discovery, is an insufficient and inappropriate basis for the Court to dismiss the case at this stage"). As this Court has recognized, "[i]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Id.* at *6 (quoting *Hosp. Bldg. Co. v.*

*Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976)). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (reversing dismissal). "The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable." *Id.* at 1216-17.

## ARGUMENT

### I. THE CAC PLAUSIBLY ALLEGES AN AGREEMENT TO RESTRICT THE SUPPLY OF CONVENTIONAL DRAM

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade." 15 U.S.C. § 1. "Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high . . . ." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984). A Section 1 conspiracy may be pleaded through parallel conduct, but because parallel conduct "could just as well be [lawful] independent action," the plaintiff "must include additional factual allegations that place that parallel conduct in a context suggesting a preceding agreement." *DRAM II*, 28 F.4th at 47 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); alteration in original). Those additional allegations are "plus factors," which are "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) ("*Musical Instruments*"). "Plus factors coupled with parallel conduct can take a complaint from merely possible to plausible." *Id.* at 1194 n.7. On a Rule 12(b)(6) motion, plaintiff need not make the "heightened showing" of "evidence that tends to exclude the possibility" of lawful independent conduct. *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1118 (9th Cir. 2022) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).[1]

[1] Defendants incorrectly assert the CAC must "identify [the agreement's] terms, each Defendant's role, or how it was implemented, monitored, or enforced" based on a mischaracterization of a footnote in *Musical Instruments*. Mot. 8 (citing 798 F.3d at 1193 & n.5). There, the Ninth Circuit merely observed that even after having obtained limited discovery, plaintiffs had failed to identify the specifics of the alleged conspiracy. 798 F.3d at 1193 n.5. The Court did not announce a heightened

Moreover, the plus factors must be considered both individually and holistically. *DRAM II*, 28 F.4th at 47-48, 53; *see also Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, 2023 WL 4677017, at *2 (9th Cir. July 21, 2023) (reversing dismissal where the district court required facts "tending to exclude the possibility that defendants acted independently" and "fail[ed] to consider the . . . Complaint holistically"). Here, the CAC pleads both parallel conduct and eleven plus factors.[2]

**A. The CAC Pleads Parallel Conduct**

The CAC pleads that Defendants engaged in parallel conduct that restricted the supply and output of DRAM sold in the U.S. CDM. Specifically, the CAC pleads that SK hynix and Micron announced production cuts three weeks apart in the fall of 2022, and Samsung joined them in April 2023. CAC ¶¶ 235-40. Defendants all announced the end of mainstream DDR4 between April and June 2025. *Id.* ¶ 260. (The "four-month gap" Defendants describe, Mot. 9, is the spread among planned final shipment dates, not announcements. CAC ¶ 260.) Defendants also all began customer vetting practices (described below) in January 2026. *Id.* ¶¶ 330-31. And for more than three years, all restricted CDM capacity while prices rose nearly eightfold. *Id.* ¶¶ 275, 416. The result was an approximately 697% compounded price increase in eighteen months. *Id.* ¶¶ 8, 272.

Defendants argue that this conduct was not parallel because it was "staggered," not "lockstep." Mot. 9. Defendants are incorrect. Parallel conduct does not require simultaneity. "[A]n unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Cir., Inc. v. United States*, 306 U.S. 208, 227 (1939). Parallel conduct "need not be identical so long as it is similar and reasonably contemporaneous." *Flextronics*, 2023 WL 4677017, at *1. Indeed, in the *DRAM II* litigation, the district court had found parallel conduct where Samsung cut output in one quarter and its rivals followed the following quarter, because "the available case law does not suggest any firm temporal limitation on 'parallel,'" *Jones v. Micron Tech. Inc.*, 400

---

pleading standard, and indeed proceeded to apply the well-established standard set forth above to evaluate the parallel conduct and plus factors there alleged. *See id.* at 1194-98.

[2] Defendants' only challenge to Counts II through VI is that they "rise and fall with" the Sherman Act claim. Mot. 23-24 (quoting *DRAM II*, 28 F.4th at 54 n.7). Because the state law claims rest on the same alleged anticompetitive agreement supporting Count I, the motion to dismiss Counts II through VI should be denied for the same reasons.

F. Supp. 3d 897, 916 (N.D. Cal. 2019), and on appeal "neither party dispute[d] th[at] finding." *DRAM II*, 28 F.4th at 45-47.

### B. The CAC Pleads Eleven Plus Factors That Suggest a Preceding Agreement

The CAC pleads eleven plus factors. As described below, these plus factors evince a plausible agreement to restrict the supply and output of DRAM in the CDM, including because they are actions "against self-interest" suggesting a "prior agreement—for example, where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *Musical Instruments*, 798 F.3d at 1195. Several of the factors below describe conduct that was costly, hard to reverse, and profitable only if the other two Defendants did the same. *See Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 327 (2d Cir. 2010) (vacating dismissal where plaintiffs "alleged behavior that would plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals'").

#### 1. Defendants Sacrificed Profits by Moving Capacity from Their More Profitable Product to a Less Profitable One

The CAC alleges that Defendants sacrificed profits by starving more profitable CDM output to supply less profitable HBM production. CAC ¶¶ 368-69, 382. Specifically, for its second fiscal quarter of 2026, Micron reported a 76 percent operating margin in the unit that sells its conventional consumer memory. *Id.* ¶¶ 370-71. At that margin, each additional 1 percent of the unit's sales was worth roughly $234 million a year in operating income, and an additional 20 percent was worth roughly $4.69 billion. *Id.* ¶ 371. Because each bit of HBM displaces three bits of conventional DRAM, HBM is the better use of a wafer "only if the profit from one HBM bit exceeds the profit from three conventional DRAM bits sold into the shortage," which requires a revenue premium per bit of roughly 2.5 to 3.8 times. *Id.* ¶¶ 374-75. Defendants have stated publicly that there is no such premium for HBM. *Id.* ¶¶ 376-82. Samsung told investors in mid-2025 that the margin gap was "expected to narrow sharply." *Id.* ¶ 376. Micron's CEO stated that "non-HBM margins are currently higher than HBM." *Id.* ¶ 380. SK hynix reports standard-memory margins at 80 percent and HBM margins at 60 percent. *Id.* ¶ 381. TrendForce's per-wafer analysis of June 2, 2026, found that a conventional DDR5

module had overtaken HBM in both revenue and profitability per wafer. *Id.* ¶ 377. The Motion itself concedes that HBM commanded a premium only "until at least spring 2026." Mot. 15.

This conduct is precisely the sort that renders a complaint plausible under *Twombly*. *See In re Fresh & Process Potatoes Antitrust Litig.*, 2012 WL 3067580, at *6 (D. Idaho July 27, 2012) (inferring that a cooperative joined a conspiracy from allegations that its board "sought to divert as much as 13% of its members' fresh potatoes into the less profitable processed potato market"). Indeed, the complaint in *Twombly* itself failed in part because it did "not allege that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period." 550 U.S. at 568. Moreover, forgoing the production and sale of higher margin DRAM during a shortage is conduct that "appears 'so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such agreement.'" *In re Cal. Bail Bond Antitrust Litig.*, 2022 WL 19975276, at *12 (N.D. Cal. Nov. 7, 2022) (quoting *Musical Instruments*, 798 F.3d at 1195).

Defendants call this margin reversal a "short-term fluctuation[]" and argue, contrary to the CAC's allegations about Defendants' margins, that "HBM was the future." Mot. 15; CAC ¶¶ 376-82. This is at best a competing account of motive, which cannot be credited at this stage of the litigation. *Cf. Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005) (reversing dismissal of a Section 2 claim because a court "cannot choose between" a "reasonable business decision" and a "willingness to sacrifice immediate profits" on "a motion to dismiss"). Moreover, as the CAC explains, HBM cannot be "the future" for most computer systems, as HBM cannot be installed or used in PCs, smartphones, and most other computing devices. CAC ¶¶ 118, 147-54.

**2. Defendants Retired Depreciated Product Lines, Halted Announced Fabs, and Held Output Below 2022 Levels as Prices Rose Nearly Eightfold**

Defendants also dismantled capacity in unison. Micron cut its DRAM and NAND wafer starts by an amount "approaching 30% versus peak 2022 levels" and told investors that the cut was a "structural reduction in capacity" that would last "for the foreseeable future." CAC ¶ 289. All three Defendants moved wafers to HBM, where each wafer yields a third as many bits, and continued to do so through March 2026. *Id.* ¶¶ 257, 373. Defendants also announced the shutdown of DDR4 lines

that were fully depreciated. *Id.* ¶¶ 260, 270. Samsung halted construction of one new plant and delayed another in 2024, and Micron's New York fab slipped to late 2030. *Id.* ¶¶ 292, 294.

Defendants argue that they "could not quickly pivot capacity back to conventional DRAM." Mot. 15. Their argument has two parts. First, they say that they "had already sunk substantial investments into HBM," including TSV processing, packaging facilities, and "the conversion of production lines from conventional DRAM to HBM," which they "could not quickly unwind." Mot. 15 (citing CAC ¶¶ 148, 161-64, 253). Second, Defendants argue that the CAC's own allegations show that capacity could not have been "converted . . . to conventional DRAM in the brief time between the alleged change in profitability and the time Plaintiffs filed the Complaint," citing the "multi-year lag" for a new fab, CAC ¶ 81, the years-long backlog for EUV lithography tools, *id.* ¶ 85, and the roughly nine months SK hynix needed to convert one line to HBM, *id.* ¶ 162. Mot. 15.

Both arguments outright contradict or mischaracterize the CAC. The CAC pleads that "[n]o new fabs were needed to restore the withheld supply" and that "[e]ach Defendant held, inside its existing fabs, the means to expand." CAC ¶ 290. The paragraphs Defendants cite for delay say nothing at all about that capacity. Paragraphs 81 and 85 describe the FBE, that is, the years a new entrant would need to build a fab and obtain EUV tools. *Id.* ¶¶ 78, 81, 85. Paragraph 162 describes SK hynix converting a conventional line to HBM, with equipment installed in one quarter and production three quarters later. *Id.* ¶ 162. These allegations make clear that Defendants had the capacity to produce conventional DRAM and also to shift capacity when they so desired, as they had done within three quarters when shifting a line to HBM. *See id.* ¶¶ 162, 257, 283-84, 416.

Defendants also argue that in an oligopolistic market, an act "that would seem against self-interest in a competitive market may just as well reflect market interdependence." Mot. 13 (quoting *Musical Instruments*, 798 F.3d at 1195). As explained below, however, the CAC alleges facts showing that the highly concentrated market protected by a powerful barrier to entry makes Defendants' conduct less likely to have been in self-interest absent agreement, particularly because of its oligopolistic nature. CAC ¶¶ 74, 78, 366-67.[3] Indeed, absent agreement, a Defendant acting alone

[3] Defendants do not challenge the sufficiency of the CAC's market definition or FBE allegations but rely on "the highly concentrated oligopoly Plaintiffs themselves plead." Mot. 13; *see also id.* at 2.

would hemorrhage market share to one or more of its large rivals. *Id.* ¶ 367. Micron, for example, with its direct-to-consumer Crucial brand, "would have leveraged its unique consumer channel to capitalize on the shortage," but chose to inexplicably scuttle its business instead. *Id.* ¶ 327.

Moreover, interdependence does not explain why a Defendant would retire depreciated lines that were selling at record prices and with steeply rising profitability, nor why it would direct resources away from that high-margin product to a lower-margin one. As the Ninth Circuit explained in *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation* ("*Petroleum Products*"): "The risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely. Changes in refinery capacity are not readily reversible. Once a company is committed to reducing its capacity it cannot easily recover if the other companies do not follow its lead. Thus, it is unlikely that a firm would undertake a reduction in its refinery capacity without some advance agreement from competitors." 906 F.2d 432, 463 (9th Cir. 1990). Here, each Defendant was situated, with differing advantages, to take market share from its horizontal competitors, but all three chose not to do so. CAC ¶¶ 356, 364, 416. On these facts, there is simply no basis to ignore the facts pleaded in the CAC in favor of unadorned lawyers' argument by Defendants.

### 3. Micron Shut Down Crucial, a Profitable Twenty-Nine-Year-Old Business, When Consumer Prices Were at Record Highs

Micron was the only Defendant that sold DRAM directly to consumers. CAC ¶¶ 308, 326. It did so for 29 years through Crucial, "the first company to sell memory directly to the consumer" and one of the most recognized retail memory brands in the world. *Id.* ¶¶ 307, 309, 323. Crucial was part of a Micron business unit with $11.86 billion in annual revenue and a 76 percent operating margin. *Id.* ¶ 321. On December 3, 2025, when consumer memory prices were up 100-500% over the prior year, Micron announced that it would shut Crucial down within three months. *Id.* ¶¶ 322, 325.

Defendants refer to this as a "unilateral exit" made to "improve supply and support for [Micron's] larger, strategic customers." Mot. 16 (quoting CAC ¶ 323). That factual argument squarely contradicts specific allegations in the CAC. Micron chose to scuttle its highly profitable consumer business just as the other two competitors had tied up their ability to produce DRAM in the CDM, including as part of Stargate agreements with OpenAI. CAC ¶¶ 304-05, 328-29. Indeed, per the CAC,

in October 2025, Samsung and SK hynix reportedly agreed to supply a single AI customer with up to 40 percent of worldwide DRAM output, in announcements that "did not identify Micron." *Id.* ¶¶ 303-04, 328. "Within several weeks," Micron, the one Defendant "uniquely positioned to monetize the consumer shortage," shuttered Crucial. *Id.* ¶¶ 328-29. Closing Crucial was Micron's way of tying up its own supply. Defendants respond that "Micron was not a party to the Stargate announcement." Mot. 17. That is the point. Moreover, rather than sell or shrink its consumer business, Micron abandoned it entirely, forgoing goodwill, brand, capacity, and sales channels. CAC ¶¶ 306-07, 309, 322-23. None of this makes economic sense absent the existence of an agreement among Defendants, nor does anything in the Complaint suggest that such an "extreme action against self-interest," *Musical Instruments*, 798 F.3d at 1195, in any way "improve[d] supply and support" for Micron's "larger, strategic customers," as Micron pretextually contended and Defendants repeat here. CAC ¶¶ 323, 326-27. To the contrary, "[t]he effect of all three decisions was the same: less conventional DRAM reaching consumers." *Id.* ¶ 329. Put simply, the CAC alleges that the exit was rational "only if Micron was confident" that its rivals "would not aggressively compete for the customers Micron was surrendering." *Id.* ¶ 326. Defendants offer only counterfactual arguments to the contrary.

#### 4. Samsung and SK hynix Locked Up Supply for AI Customers While Refusing Long-Term Contracts to Conventional Customers

By 2024 and 2025, SK hynix and Micron had presold their HBM output through 2026, and on October 1, 2025, Samsung and SK hynix were announced as suppliers of up to 900,000 wafers a month to a single AI customer. CAC ¶¶ 256, 303, 404. Conventional DRAM customers received the opposite treatment. On January 6, 2026, TrendForce reported that Samsung and SK hynix were refusing the two- and three-year contracts their largest server customers wanted and were instead "sticking to quarterly contracts, anticipating stepwise DRAM price increases each quarter through 2027." *Id.* ¶ 414. By turning down guaranteed long-term business, Samsung and SK hynix acted with the conviction that prices would keep rising and that they would not be undercut by the others. *Id.* ¶ 415. The Ninth Circuit "has recognized that a distributor's repeated rejection of lucrative bids in an anticompetitive market environment raises an inference of conspiratorial antitrust conduct." *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1251 (9th Cir. 1990) (reversing summary

judgment). The inference is particularly appropriate here, as "consistently bad business judgment is not to be expected from able and experienced corporate decisionmakers." *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 484 (9th Cir. 1988) (quoting *Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485, 501 (5th Cir. 1982)).

**5. All Three Defendants Announced Their Exit from DDR4 Within the Same Three Months**

The Supreme Court has recognized that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," support an inference of conspiracy. *Twombly*, 550 U.S. at 556 n.4. *DRAM II* held that the factor had not been met given the allegations in that complaint because the smaller firms' changes simply followed "market leader Samsung." 28 F.4th at 48-49. Here, in contrast, all three Defendants announced the retirement of an entire product generation "between approximately April and June" of 2025. CAC ¶ 260. DDR4 "remained in wide use," and Samsung was producing it on depreciated lines that were "inexpensive to keep running." *Id.* ¶¶ 261, 270. By August 2025, after Defendants' simultaneous conduct, a DDR4 chip cost about $9.17, against about $5.99 for the DDR5 chip designed to replace it. *Id.* ¶ 270. Defendants attribute their contemporaneous exits to "growing price competition from Chinese manufacturers" and to obsolescence. Mot. 14. DDR4 was not, however, obsolete, as made clear by allegations that its price rose above that of its successor, DDR5. ¶ 270. In addition, if Defendants had been acting in response to Chinese competition, they would have cut prices or defended their market share. Instead, they abandoned their fully depreciated production lines in unison, while prices climbed. *Id.* ¶¶ 264, 270. Defendants' argument both contradicts the allegations in the CAC and defies economic reality.

**6. All Three Defendants Began Vetting Their Customers in the Same Month, Which Gave Each the Means to Monitor the Restraint**

In approximately January 2026, all three Defendants "simultaneously implemented enhanced due diligence and customer vetting procedures for DRAM orders." CAC ¶ 330. One customer described the change: "The three companies became stricter and asked us about who we will supply to, how much quantity, and if the demand of our customers are real." *Id.* ¶ 331. The CAC alleges that sellers in a competitive market "differentiate on customer service" and "do not simultaneously adopt

the same order-vetting questions." *Id.* ¶ 333. The simultaneous customer vetting also "gives each Defendant a structured view of who is purchasing DRAM and in what quantities," and it "bears a direct resemblance to the monitoring mechanisms of the 1998-2002 cartel," whose members exchanged "information on sales of DRAM to certain customers, for the purpose of monitoring and enforcing adherence to the agreed-upon prices." *Id.* ¶¶ 217, 334. This sort of conduct—a small group of oligopolists simultaneously adopting parallel vetting procedures that provide them insight into marketwide supply—is of a type "that facilitates price fixing that would be difficult for the authorities to detect," weighing in favor of the plausibility of the alleged conspiracy. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (affirming denial of motion to dismiss where "four defendants s[old] 90 percent of U.S. text messaging services, and it would not be difficult for such a small group to agree on prices and to be able to detect 'cheating' without having to create elaborate mechanisms").

Defendants call it "unremarkable" that suppliers in a shortage would "independently question customers" in order "to prevent over-ordering and hoarding," and they add that export controls would have led each of them to ask similar questions. Mot. 16. Again, Defendants contradict allegations that the customer vetting was not at all independent but was instituted by all three Defendants simultaneously. CAC ¶¶ 330-31, 333. Defendants also inexplicably cite CAC paragraphs concerning U.S. export controls on chipmaking equipment bound for China, *id.* ¶¶ 92, 213, 298, which were instituted more than two years before the customer vetting practices began, *id.* ¶¶ 74, 213, 330.

#### 7. Samsung Reversed Its Public Refusal to Cut, and Each Defendant Abandoned Its Established Strategy

Each Defendant radically shifted its own bespoke business strategy away from its historical advantages and conduct, evincing the existence of an agreement. CAC ¶¶ 356, 364. In late January 2023, Samsung announced that there would be "no artificial production cut," but in April 2023, it cut output. *Id.* ¶¶ 360-61. Before 2022, Samsung used its scale to "pursue market-share gains in downturns," Micron relied on "downstream participation through its Crucial consumer brand," and SK hynix "focused on relationships with OEM customers." *Id.* ¶ 356. Each abandoned the very strategy that had in the past provided it with a competitive advantage. *Id.* ¶¶ 358-64. This

simultaneous shift in business strategy indicates the existence of an anticompetitive agreement to restrict output. *See In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1095 (N.D. Cal. 2007) ("marked shift in behavior" supported inference of conspiracy although the acts fell "a month or more apart").

**8. Defendants Publicly Assured One Another That They Would Not Compete for Share**

On September 29, 2022, before any Defendant had cut supply and output, Micron told investors its "goal" was "to maintain stable bit supply share as well as supply discipline." CAC ¶ 341. Micron repeated this in December 2023, June 2024, September 2024, and March 2026. *Id.* ¶ 342. SK hynix announced the first cut a month later and told investors that "memory suppliers have begun taking actions, such as cutting back on CapEx and adjusting utilization rates." *Id.* ¶¶ 235, 337. Samsung reported it was reducing inventory "by production adjustment rather than by aggressive sales expansion." *Id.* ¶ 340. On November 27, 2024, with prices climbing, SK hynix adopted a written "Capex Discipline" policy capping annual investment as a share of revenue. *Id.* ¶ 385. Each Defendant tied itself to the mast of the conspiracy and publicly signaled as much. *Id.* ¶¶ 335-42, 385-86.

Defendants argue that *DRAM II* holds that statements to investors cannot support an inference of conspiracy. Mot. 20-21. That reading is inconsistent with longstanding Ninth Circuit precedent. Indeed, "[a] knowing wink can mean more than words." *Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965). The Ninth Circuit has also "reject[ed]" as "circular" the argument that information "cannot support an inference of conspiracy because the information was 'publicly available,'" since it "was publicly available only because the appellees chose to make it so." *Petroleum Prods.*, 906 F.2d at 447. Moreover, *DRAM II* merely addressed allegations that one competitor's public statements had influenced the others and held that plaintiffs there "point[ed] to nothing suggesting that Samsung or SK Hynix were influenced by Micron's praise." 28 F.4th at 50. The statements here, however, served as assurances. Micron pledged to "maintain stable bit supply share" before any rival had cut, and SK hynix cut four weeks later. CAC ¶¶ 235, 341. SK hynix's written investment cap is, as the CAC alleges, "a standing assurance to rivals that SK Hynix will not expand to take their share." *Id.* ¶ 386. "[A] conspiracy to fix prices can be inferred from an invitation,

followed by responsive assurances and conduct," including a producer's public statement that it was cutting production, followed by its rivals' announcements of their own cuts. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008).

**9. Defendants' Executives Gathered Before Each Move**

The CAC pleads opportunity to conspire with the specificity that the *DRAM II* complaint lacked. The Ninth Circuit discounted the trade association allegations there because the plaintiffs did "not allege facts demonstrating that Defendants actually communicated or exchanged information at these trade association meetings." 28 F.4th at 52. The CAC here, in contrast, identifies the gatherings, the dates, and the executives at issue. CAC ¶¶ 402-04. An industry conference ended five weeks before SK hynix's first cut in supply and output. *Id.* ¶ 404. Two more gatherings, including one "at which both Samsung and SK Hynix presented," took place weeks before Samsung's reversal of its statement that it would not cut. *Id.* ¶ 404. In September 2025, named executives of all three Defendants appeared together at a "Memory Executive Summit," weeks before the Stargate announcements and the Crucial shutdown. *Id.* ¶¶ 402, 404. The CAC thus pleads that each coordinated move followed a documented meeting of the people who would have had to have agreed. *Id.* ¶ 404. Such allegations press the alleged conspiracy further into plausibility. *See, e.g.*, *Solyndra Residual Tr. ex rel. Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1040 (N.D. Cal. 2014) (finding conspiracy plausibly alleged where defendants met at an association's annual forums, and "[a]fter each Forum held between 2007 and 2010, Defendants' prices uniformly fell precipitously").

**10. The Conventional DRAM Market Is Conducive to Conspiracy**

"Extreme market concentration may suggest conspiracy, particularly when accompanied by other plausible plus factor allegations." *DRAM II*, 28 F.4th at 52. The Ninth Circuit applied that statement in *Flextronics* to reverse a dismissal, relying on allegations that the market was concentrated, that the product was "an interchangeable commodity," that there were "high barriers to entry," and that demand was inelastic. 2023 WL 4677017, at *4. The CAC pleads a market in which three firms hold roughly 90 percent share, the product is standardized, contract prices are published quarterly, and the FBE forecloses or impedes entry. CAC ¶¶ 58, 66, 78, 203, 207-09. Defendants respond that shifts in share "undermine[]" any inference of coordination. Mot. 22. The shares

Defendants cite include HBM, in which SK hynix holds 56 percent. CAC ¶ 208. On the CAC's estimate of conventional DRAM alone, Samsung remains the largest producer, and the CAC pleads no gain by any Defendant at another's expense. *Id.* ¶ 208.

**11. The Same Firms Previously Conspired to Price-Fix the Same Product**

Samsung and SK hynix's predecessor pleaded guilty to fixing DRAM prices from 1998 to 2002, and Micron admitted its participation in exchange for leniency. CAC ¶¶ 216-23. Defendants call that history "decades-old." Mot. 22. *DRAM II* rejected the same argument. "While the prior conspiracy among Defendants occurred approximately twenty years ago, the present allegations involve the same alleged coordination and actors. Accordingly, this plus factor circumstantially supports Plaintiffs' theory." 28 F.4th at 53. The factor fell short in *DRAM II* only because it stood alone, "without some further factual support." *Id.* The plus factors set out above supply that support. Courts in this District have given the same DRAM convictions weight in cases about other memory products. *See*, *e.g.*, *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1149 (N.D. Cal. 2009) ("the purpose of both conspiracies was to artificially control and impact the memory market").

**C. Viewed Together, the Plus Factors Plausibly Suggest a Preceding Agreement**

The plus factors "must be evaluated holistically" because "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *DRAM II*, 28 F.4th at 53 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). At the pleading stage, the Ninth Circuit gives plaintiffs "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) (reversing dismissal) (quoting *City of Long Beach v. Standard Oil Co.*, 872 F.2d 1401, 1405 (9th Cir. 1989)). Indeed, the Ninth Circuit recently reversed the dismissal in *Flextronics* where the district court "fail[ed] to consider the . . . Complaint holistically." 2023 WL 4677017, at *2. Here, Defendants invite legal error by asking the Court to evaluate each plus factor in isolation and to credit fact-bound explanations for each of them. Mot. 13-17, 20-22. Moreover, even if Defendants "may be right when they insist that there are innocuous, permissible reasons" for their conduct, "the Court must consider the facts in the light most favorable to Plaintiff." *Teva*, 2025

WL 2637507 at *16. Taken together, the allegations here coherently set forth the contours of the alleged conspiracy. Defendants' simultaneous public statements, CAC ¶¶ 335-42, 385-86, restriction of supply and output, *id.* ¶¶ 235-40, 288-89, 416, shuttering of business lines and products, *id.* ¶¶ 260, 270, 322, profit sacrifice, *id.* ¶¶ 368-82, and shifts in business strategy, *id.* ¶¶ 356-64—all against the backdrop of a concentrated market protected by a powerful barrier to entry, *id.* ¶¶ 78, 206-08, as well as a shared history of criminal price fixing, *id.* ¶¶ 216-23, 390—cannot simply be dismembered into pieces and explained away in turn, particularly at the pleading stage. *Cont'l Ore*, 370 U.S. at 699; *Sunday Ticket*, 933 F.3d at 1152. These facts together describe "the sort of restricted freedom of action and sense of obligation that one generally associates with agreement," *Twombly*, 550 U.S. at 556 n.4 (quotation marks omitted), and they "raise a reasonable expectation that discovery will reveal evidence of illegal agreement," *id.* at 556.

### D. *DRAM II* Is Distinguishable

Defendants argue that this case "recycles" *DRAM II*. Mot. 1. Not so. To begin with, the market structure and shares alleged in *DRAM II* are different than those alleged here. In *DRAM II*, Samsung held "approximately one-half market share" against "approximately one quarter" each for Micron and SK Hynix, and when Samsung cut output in the third quarter of 2016, Micron and SK Hynix "followed suit . . . the following quarter." 28 F.4th at 45. The conduct alleged there was also materially different. In contrast to the detailed plus factor allegations described above (at section I.B, *supra*), plaintiffs in *DRAM II* pleaded no product exits, capacity diverted to a lower-margin product, business closures, contract refusals, or customer vetting, among other notable differences. *See id.* at 45-46 (describing the allegations), 48-53 (addressing the plus factors alleged).

Moreover, the Ninth Circuit's affirmance of the dismissal of the complaint in *DRAM II* rested on the central premise that plaintiff alleged what was essentially a "follow the leader" theory, in which competitors who follow one firm's "risky business move" all benefit. 28 F.4th at 48 n.3. Specifically, the Court held that "the two smaller manufacturers" followed a quarter later, timing "more indicative of the 'follow the leader' theory than an advance agreement." *Id.* at 49. Micron's statement that it would be "foolish [for Micron] to be the first ones to take capacity off" reflected that "as a non-leader in the industry, it would be economically wise for Micron to follow the market leader's actions." *Id.*

Here, the CAC alleges the opposite of what made the follow-the-leader strategy alleged in *DRAM II* economically rational. It alleges the two smaller producers cut first—SK hynix on October 26, 2022, and Micron three weeks later. CAC ¶¶ 235-36. Samsung had announced no cuts as of January 2023, said publicly that "there will be no artificial production cut," and was expected by analysts to "gain market share from smaller peers," as it had for decades by "maintaining or increasing production during downturns to crush weaker competitors." *Id.* ¶¶ 238, 358, 360. SK hynix and Micron thus withdrew output while Samsung, best placed to take their customers, refused to cut. Contrary to the follow-the-leader strategy in *DRAM II*, their cuts here were "so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *Musical Instruments*, 798 F.3d at 1195. Moreover, in the face of the cuts by its smaller rivals, Samsung then reversed course, announcing on April 7, 2023, that it was "lowering the production of memory chips by a meaningful level." CAC ¶¶ 240, 361. Samsung followed the two smaller producers rather than leading them, giving up its "decades-long counter-cyclical strategy." *Id.* ¶ 358. That reversal, the CAC alleges, "is rational only if Samsung had assurance that its rivals would likewise restrain rather than exploit Samsung's sacrifice." *Id.*

## II. CONDITIONAL REQUEST FOR LEAVE TO AMEND

If the Court concludes any claim is insufficiently pleaded, Plaintiffs respectfully request leave to amend, as any such insufficiency could be cured through amendment.

## CONCLUSION

Defendants' Motion should be denied.

Dated: September 22, 2026

Respectfully submitted,

**BATHAEE DUNNE LLP**

*/s/ Brian J. Dunne*
Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*/s/ Yavar Bathaee*
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Priscilla Ghita (CA 368190)
pghita@bathaeedunne.com
3420 Bristol Street, Suite 600
Costa Mesa, CA 92626

*Attorneys for Plaintiffs and the Proposed Classes*

**FILER ATTESTATION**

I am the ECF user who is filing this document. Pursuant to Civil L.R. 5-1(h)(3), I attest that each of the other signatories has concurred in the filing of this document.

Dated: September 22, 2026 By: */s/ Brian J. Dunne*