HEATHER S. NYONG'O (S.B. #222202)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California Street, Suite 2400
San Francisco, CA 94108
Telephone: (415) 796-4480
hnyongo@cgsh.com

*Counsel for Defendants SK hynix Inc. and SK hynix America Inc.*

DIANA A. AGUILAR ALDAPE (S.B. #304427)
SARA N. PAHLAVAN (S.B. #332945)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: (415) 984-8700
daguilar@omm.com
spahlavan@omm.com

*Counsel for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*

RACHEL S. BRASS (S.B. # 219301)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8293
rbrass@gibsondunn.com

*Counsel for Defendant Micron Technology, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

MARC GARCIAGUIRRE, et al.,

*Plaintiffs*,

v.

SAMSUNG ELECTRONICS CO., LTD., et al.,

*Defendants*.

Case No. 5:26-cv-06345-NW

**DEFENDANTS SAMSUNG ELECTRONICS, SK HYNIX, AND MICRON'S REPLY IN SUPPORT OF MOTION TO DISMISS CLASS ACTION COMPLAINT**

**Oral Argument Requested**

| | |
|---|---|
| Hearing Date: | October 21, 2026 |
| Time: | 9:00 A.M. |
| Place: | Courtroom 3, 5th Floor |
| Judge: | Hon. Noël Wise |

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 1

A. Plaintiffs allege staggered decision-making, not parallel conduct. ..... 2

B. Plaintiffs' plus-factor allegations do not suggest a conspiracy. ..... 3

1. Plaintiffs cannot reconcile their pleadings with their "actions against self-interest" plus-factor arguments. ..... 4

2. Based on Plaintiffs' allegations, Defendants' business strategy changes were independent responses to common stimuli. ..... 9

3. Ordinary investor communications do not move the needle to plausibility. ..... 10

4. Plaintiffs do not plausibly allege that customer vetting served as a monitoring mechanism. ..... 11

5. Plaintiffs' "opportunities to conspire" argument falls flat. ..... 12

6. Market structure is a neutral fact. ..... 12

7. Decades-old history does not save Plaintiffs' implausible theories. ..... 13

C. "Holistic" review confirms the Complaint should be dismissed. ..... 13

D. Plaintiffs cannot distinguish this case from *DRAM II*. ..... 14

E. Plaintiffs' state-law claims fail with their federal claim. ..... 15

F. Plaintiffs' request for leave to amend should be denied. ..... 15

III. CONCLUSION ..... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. Corp v. Twombly*,
550 U.S. 544 (2007) .......... 6, 9, 10

*Bonin v. Calderon*,
59 F.3d 815 (9th Cir. 1995) .......... 15

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) .......... 7

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
28 F.4th 42 (9th Cir. 2022) .......... *passim*

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Litig.*,
2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) .......... 6, 12

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) .......... 13

*In re Flat Glass Antitrust Litig.*
385 F.3d 350 (3d Cir. 2004) .......... 3

*Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*,
2023 WL 4677017 (9th Cir. July 21, 2023) .......... 13

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) .......... 4

*Jien v. Perdue Farms, Inc.*,
2020 WL 5544183 (D. Md. Sept. 16, 2020) .......... 2

*Jones v. Micron Tech. Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019) .......... 5, 8, 10, 12

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) .......... 2, 14

*In re Musical Instruments and Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .......... *passim*

*Prosterman v. Am. Airlines, Inc.*,
747 F. App'x 458 (9th Cir. 2018) .......... 3

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) .......... 12

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015)........ 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008)........ 11

*Valspar Corp. v. E.I. Du Pont De Nemours and Co.*,
873 F.3d 185 (3d Cir. 2017)........ 3

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
328 F. Supp. 3d 824 (N.D. Ill. 2018)........ 6

## I. INTRODUCTION

Plaintiffs' Opposition confirms the fatal shortcomings of their Complaint: Across hundreds of paragraphs, it identifies no meeting, communication, exchange of nonpublic information, invitation to agree, or other allegation connecting Defendants' independent decisions to an agreement. Rather, Plaintiffs ask the Court to infer an antitrust conspiracy from unilateral business decisions Defendants made at different times in response to the same industry-wide conditions that the Complaint sets out. In particular, Plaintiffs allege that, in 2022, Defendants all faced the same problem: a glut of conventional DRAM supply, shrinking demand, and massive losses. Not surprisingly, each Defendant decided to temper its production capacity. When the AI boom took shape, Defendants each shifted production from DRAM to HBM, a growing and more profitable product used in AI data centers. When the profitability of conventional DRAM finally rebounded relative to HBM, Defendants did not immediately pivot capacity back to DRAM because they had committed to producing substantial volumes of HBM. Plaintiffs second-guess those decisions, but nothing in the Complaint makes an antitrust conspiracy more plausible than the obvious alternative of a common response to common economic circumstances in an oligopolistic market.

In an attempt to meet the plausibility requirement, Plaintiffs rely exclusively on circumstantial evidence. They insist that Defendants acted in parallel, despite alleging that SK hynix moved first, followed by Micron three weeks later, and Samsung nearly *five months* after that. Timing aside, Plaintiffs do not put forward allegations that place any "parallel conduct in a context suggesting a preceding agreement." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 45 (9th Cir. 2022) ("*DRAM II*"). And, even considered "holistically," the allegations do not suggest agreement as opposed to lawful interdependence.

The Court should apply *DRAM II* and dismiss the Complaint.

## II. ARGUMENT

Plaintiffs in effect concede they do not allege direct evidence of a conspiracy and instead must rely on circumstantial evidence of an agreement: parallel conduct and so-called "plus" factors, *i.e.*, facts that would place that conduct "in a context suggesting a preceding agreement." Dkt. No.

62 ("Opp.") 11 (quoting *DRAM II*, 28 F.4th at 47).

**A. Plaintiffs allege staggered decision-making, not parallel conduct.**

Defendants have demonstrated that the alleged conduct was not parallel, with months passing between what Plaintiffs identified as "parallel" decisions. Dkt. No. 58 ("Mot.") 9–10. Plaintiffs say that the actions in question "need not be [temporally] identical so long as it is similar and reasonably contemporaneous." Opp. 12 (quoting *Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.,* 2023 WL 4677017, at *1 (9th Cir. July 21, 2023)). But Plaintiffs allege neither. SK hynix announced its first production cut on October 26, 2022, and Micron followed a few weeks later. Dkt. No. 1 ("Compl.") ¶¶ 235, 236. Samsung publicly declared in January 2023 that it would *not* cut production; it flatly stated that "there w[ould] be no artificial production cut" and reiterated its stance a month later. *Id.* ¶ 360. It was not until almost *six months* after the SK hynix announcement, in April 2023, and after Samsung suffered a KRW 4.58 trillion ($3.51 billion) quarterly loss, that Samsung decided to reduce production. *Id.* ¶¶ 240–41. That is hardly "parallel." Similarly, the reallocations of production to HBM spanned roughly three years, *id.* ¶ 257—nearly the entirety of the AI boom driving HBM demand, *id.* ¶ 206, and the DDR4 phaseouts ran on company-specific schedules with final shipments four months apart, *id.* ¶ 260. This type of timing "refute[s] rather than support[s]" an inference of conspiracy. *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) ("*In re Late Fee*") (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 131–32 (3d Cir. 1999)); Mot. 9.

Plaintiffs invoke *Jones v. Micron Tech. Inc.* for its statement that there is no "firm temporal limitation" on parallelism. Opp. 12–13 (citing 400 F. Supp. 3d 897, 916 (N.D. Cal. 2019)). But as they concede, that case involved only a single-quarter lag in conduct, much shorter than the gaps alleged here. *Id.*; *see In re Late Fee*, 528 F. Supp. 2d at 962 (multi-year lag in conduct insufficient to support a conspiracy); Mot. 9. Further, Plaintiffs' stray reference to similar customer vetting is insufficient to find parallel conduct. *See Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *8 (D. Md. Sept. 16, 2020) (dismissing *per se* claim and explaining that "[t]o find parallel conduct, it is not enough to simply show that companies were acting similarly in any limited way") (cleaned up).

Tellingly, Plaintiffs neither distinguish the authority cited in Defendants' motion, nor cite any case finding parallelism on facts similar to their own allegations. *See* Mot. 9; Opp. 12–13.

**B. Plaintiffs' plus-factor allegations do not suggest a conspiracy.**

Even if this staggered conduct qualified as parallel, each of Plaintiffs' plus factors would still amount to "a restatement of the conscious parallelism endemic to an oligopoly," which is "insufficient to survive a motion to dismiss." *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 461 (9th Cir. 2018); *see DRAM II*, 28 F.4th at 48–51. To start, Plaintiffs focus on supposed actions against self-interest and motive to conspire. But, as the Third Circuit has explained, "in the case of oligopolies [these alleged plus factors] are deemphasized because they 'largely restate the phenomenon of interdependence.'" *Valspar Corp. v. E.I. Du Pont De Nemours and Co.*, 873 F.3d 185, 193 (3d Cir. 2017); *see also In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015) ("*Musical Instruments*") (similar). "[E]vidence of a motive to conspire means the market is conducive to price fixing, and evidence of actions against self-interest means there is evidence of behavior inconsistent with a competitive market" but "those qualities are intrinsic to oligopolies." *Valspar*, 873 F.3d at 193 (internal quotation marks and citation omitted). In oligopolistic markets, courts instead look for percipient "evidence implying a traditional conspiracy." *In re Flat Glass Antitrust Litig*. 385 F.3d 350, 360 (3d Cir. 2004).

That paradigm makes sense because "progressive adoption of similar policies across an industry … does not reveal anything more than similar reaction to similar pressures within an interdependent market, or conscious parallelism." *DRAM II*, 28 F.4th at 48 (quoting *Musical Instruments*, 798 F.3d at 1196). That is what happened here. Plaintiffs concede that each Defendant faced common allocation decisions and the same AI-driven demand given that conventional DRAM and HBM use the same wafers. Compl. ¶¶ 65, 256. Having failed to allege any evidence of a traditional conspiracy, Plaintiffs are left with allegations that reveal nothing more than ordinary competition in an oligopolistic market.

**1. Plaintiffs cannot reconcile their pleadings with their "actions against self-interest" plus-factor arguments.**

Plaintiffs insist that they have pleaded eleven plus factors, but five are simply variations on the same theme: that Defendants allegedly acted against their economic self-interest by producing more HBM and less conventional DRAM. *See* Opp. 13–18. That argument falls flat for two fundamental reasons. *First*, the action-against-self-interest inquiry does not ask whether there were alternative business decisions available to Defendants that in theory might have been better. Rather, it asks whether their conduct was "*so perilous* in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *Musical Instruments*, 798 F.3d at 1195 (emphasis added). The "pressures of an interdependent market" here give rise to "conscious parallelism," *id.*—meaning the alleged conduct is "economically rational," does not constitute such an "*extreme* action against self-interest," and provides no basis for an antitrust conspiracy claim. *DRAM II*, 28 F.4th at 50 (citing *Musical Instruments*, 798 F.3d at 1195) (emphasis added). *Second*, as to each of Plaintiffs' theories, the Complaint pleads "ample independent business reasons" for each Defendant's choices "even absent an agreement"—including downturn-driven losses, capital constraints, AI-driven demand, and sunk HBM investments. *See Musical Instruments*, 798 F.3d at 1195; *see also* Mot. 13–17.

*Profit sacrifice*. Plaintiffs argue that "Defendants sacrificed profits by moving capacity from their more profitable product to a less profitable one." Opp. 13 (cleaned up). The Complaint says the *opposite*. It alleges that HBM was *more profitable* than conventional DRAM throughout almost the entire relevant period, Compl. ¶¶ 12, 60, 152, and that the HBM premium did not compress until spring 2026, *id.* ¶ 377. The Complaint further alleges that demand was weak, prices dropped, and each Defendant sustained *billions* in losses on conventional DRAM in 2022. *Id.* ¶¶ 7, 241. And it acknowledges that Defendants' fortunes reversed only after they moved capacity *from* conventional DRAM *to* HBM. *Id.* ¶¶ 8, 60. In short, Plaintiffs allege a *pursuit* of profits, not a profit sacrifice. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 994 (9th Cir. 2020) (concluding there was no profit sacrifice where "Qualcomm's purpose was greater profits in both the short and long terms").

The Complaint also undermines Plaintiffs' argument that Defendants acted irrationally by

not immediately pivoting production to conventional DRAM in spring 2026. Opp. 13–14. In that regard, Plaintiffs allege that Defendants captured record prices for conventional DRAM by not expanding supply during that period. Compl. ¶¶ 286, 365. That is consistent with rational, profit-seeking behavior: "Selling goods at higher prices can be in an entity's best interest—this is but one method companies use to turn a profit." *Jones*, 400 F. Supp. 3d at 920. At a more fundamental level, Plaintiffs' allegations stumble on two questions. First, *could* Defendants immediately respond to changes in relative profit margins between conventional DRAM and HBM in spring 2026? And second, would *not* responding be "so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement"? *Musical Instruments*, 798 F.3d at 1195. The Complaint supplies the answer to both: no.

Plaintiffs argue that "no new fabs were needed to restore the withheld supply." Opp. 15 (citing Compl. ¶ 290). But their only support is the generic allegation that "[m]emory supply can be expanded by migrating to more advanced process nodes with yield improvements, which increases bit supply without requiring new greenfield wafer capacity additions." Compl. ¶ 290. That is a *non sequitur*. That the industry can increase bit supply over time through "node migration" says nothing about whether Defendants *could* have immediately increased conventional DRAM capacity in spring 2026. And Plaintiffs' allegations foreclose that inference. Plaintiffs allege that SK hynix and Micron had *already* sold out of DRAM for 2026 in prior years, *id.* ¶¶ 256, 373; and that expanding or pivoting DRAM capacity is quite expensive and slow, *id.* ¶¶ 62–63, 79, 85, 92, 162, 292–93; *see also id.* ¶ 160 ("HBM and conventional DRAM are not produced together"); *id.* ¶ 155 (fabs "cannot be readily converted to produce other types of semiconductors.").

Plaintiffs never meaningfully address the second question either: whether declining to expand conventional DRAM capacity in early 2026 was "so perilous in the absence of advance agreement that no reasonable firm would" do it. *See Musical Instruments*, 798 F.3d at 1195. Plaintiffs argue that *not* expanding during a shortage would leave any individual Defendant exposed to a catastrophic loss of market share. Opp. 14–16. But that is the same argument the district court and Ninth Circuit rejected in *DRAM II*. The district court explained that restraining output in an interdependent market is "economically rational" because "market participants 'share' monopoly

power." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Litig.*, 2020 WL 8459279, at *8 n.9 (N.D. Cal. Nov. 24, 2020) ("*DRAM II*"). The Ninth Circuit concluded that "while Plaintiffs claim that it would have been in Micron and SK [h]ynix's best interest to capture Samsung's lost market share, it was also economically rational to follow Samsung's lead and focus on profitability." *DRAM II*, 28 F.4th at 49.

As the Supreme Court has held, "resisting competition is routine market conduct" in an oligopoly. *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 566 (2007). Conduct that may be perilous in a perfectly competitive market (e.g., unilaterally tempering output) is neither risky nor irrational when rivals are likely to follow suit. *See, e.g., Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 832 (N.D. Ill. 2018) (dismissing complaint and noting "a substantial likelihood" that oligopolists "would have tried to capitalize on output restrictions signaled by the other, as it was in their independent interests to restrict supply and drive up prices"). Accordingly, Plaintiffs' allegations "are all consistent with Defendants, as competitors in a highly concentrated market, reacting to the same market pressures and taking parallel action to serve their interests." *DRAM II*, 28 F.4th at 53.

*"Dismantled" Capacity*. Plaintiffs' argument that Defendants "dismantled capacity" in 2023 that could otherwise be dedicated to conventional DRAM, Opp. 14–16, unravels for the same reason: their own allegations explain that restraining output was economically rational in the DRAM market. *See* Mot. 13–16. Plaintiffs never explain why Defendants should have forgone a generational opportunity to produce HBM, which their Complaint acknowledges was more profitable than conventional DRAM until at least spring 2026. Compl. ¶¶ 12, 60, 152, 327, 377. Nor do they reconcile their claim that Defendants should have retreated to legacy products like DDR4 with their allegation that Chinese manufacturers were "ramp[ing] DDR4 production and pric[ing] their DDR4 chips at roughly half the cost of [Defendants'] comparable" products, eroding margins. *Id.* ¶ 264. And after alleging that it takes at least three quarters to *convert* conventional DRAM and HBM production lines, *id.* ¶ 162, they never reckon with their allegations that conventional DRAM only became more profitable than HBM in Q1 2026—not even three quarters before they filed their complaint.

Plaintiffs argue that Defendants *should* have attempted to take market share from one another but chose not to do so. Opp. 16. But Plaintiffs fail to address the Ninth Circuit's holding on this critical point in *DRAM II*: Defendants had compelling *independent* reasons not to engage in vigorous market-share competition, particularly after a period of cratering demand and falling prices. 28 F.4th at 49.

Finally, Plaintiffs press the same argument the plaintiffs in *DRAM II* made to the Ninth Circuit: that supply cuts are inherently irrational and perilous absent conspiracy. Opp. 16 (citing *In re Coordinated Pretrial Procs. in Petroleum Products Antitrust Litig.*, 906 F.2d 432, 463 (9th Cir. 1990) ("*Petroleum Products*")).[1] The Ninth Circuit rejected that argument and held that plaintiffs did not "establish[] that Defendants' supply cuts were the 'extreme action against self-interest' contemplated by this circuit as a plus factor." *DRAM II*, 28 F.4th at 50 (quoting *Musical Instruments*, 798 F.3d at 1195). Rather, it explained that "restraining supply without an agreement was not as perilous as Plaintiffs claim[ed]" because it did not pose a catastrophic risk of market-share loss in the DRAM industry. *Id.* at 49.

That point is even more salient now, given that tempering conventional DRAM capacity enabled Defendants to accelerate the buildout of HBM capacity and diversify their revenue base. Compl. ¶ 251 (alleging that Defendants "redirected a significant portion of manufacturing capacity and capital expenditure from commodity DRAM to [HBM]"). Plaintiffs' allegation that these decisions produced record profits further undercuts any claim that the challenged conduct was perilous absent an agreement. Those facts distinguish this case (and *DRAM II*) from *Petroleum Products*, on which Plaintiffs rely. Opp. 16. Plaintiffs' final point—that "[e]ach Defendant held, inside its existing fabs, the means to expand," *Id.* 15 (quoting Compl. ¶ 290)—does not grapple with the totality of their pleadings (which allege that capacity conversion and expansion are costly and slow) or with the incentives of firms in a very concentrated market like the one at issue.

*Micron's Crucial Exit*. Plaintiffs do not explain why Micron's unilateral decision to exit its Crucial consumer brand plausibly suggests a conspiracy. Plaintiffs imply that Micron exited

[1] *See In re Citric Acid Litig.*, 191 F.3d 1090, 1096 (9th Cir. 1999) (recognizing as dicta *Petroleum Products*' discussion of the standard used when plaintiffs rely only on circumstantial evidence).

consumer memory entirely. *Id.* 16. But the Complaint itself alleges that Micron decided only to no longer market the Crucial brand, not that Micron's exit from Crucial cut overall capacity. Compl. ¶ 322. Elsewhere, Plaintiffs acknowledge that Micron and the other Defendants sell DRAM to memory module assemblers, who themselves sell to retailers and consumers. *Id.* ¶ 66. Plaintiffs plead nothing to suggest that Micron's decision to continue selling DRAM for consumer applications—just not through its own brand—cost it profits or otherwise made no economic sense. To the contrary, according to the Complaint, Micron reported "revenue of $23.9 billion, … an increase of about 195% year-over-year." *Id.* ¶ 187.

Nor do Plaintiffs reckon with Micron's rationale for its decision: pursuing "larger, strategic customers in faster-growing segments." *Id.* ¶ 323. When Micron made that decision in late 2025, HBM was more profitable than conventional DRAM. *Id.* ¶¶ 322, 325. In a market in which AI-driven demand created a surge in memory requirements, *id.* ¶ 8, and in which HBM products offered substantial growth opportunities with less exposure to Chinese competitive pressure, *id.* ¶¶ 93, 264, Micron's decision to consolidate around higher-value customers was economically rational. It was predictable that Micron would see "the extraordinary demand created by the AI boom," *id.* ¶ 366, and take steps to better position itself to capture some of it, as its competitors had done. *See Jones*, 400 F. Supp. 3d at 920 ("It is not unlawful for competitors to mimic the actions of another, especially in such a small market."). Because that decision is consistent with lawful conscious parallelism, it does not plausibly suggest a conspiracy. *See also* Mot. 16–17.

*Short- Versus Long-Term Contracts*. Plaintiffs accuse Samsung and SK hynix of "bad business judgment" for preferring quarterly DRAM contracts with their largest server customers instead of multi-year deals, and insist that a conspiracy is the only explanation for their "rejection of lucrative bids." Opp. 17–18 (citation omitted). But Plaintiffs assume without support that multi-year contracts would have been lucrative. They do not allege any facts showing that long-term agreements would be more profitable than other opportunities for Defendants' output. Nor do Plaintiffs acknowledge the potential opportunity costs of long-term agreements. In a cyclical, volatile industry, locking in multiyear commitments at prices that may prove to be below-market carries substantial downside risk. Indeed, the Complaint alleges that Samsung and SK hynix

"anticipat[ed] stepwise DRAM price increases each quarter through 2027." Compl. ¶¶ 355, 414. Thus, Samsung and SK hynix served their own self-interest by renegotiating contracts quarterly to capture the price upside. With "vast demand and profitability available in conventional DRAM," *id.* ¶ 323, that is a perfectly reasonable strategy for a profit-maximizing firm.

*DDR4 Retirement*. Plaintiffs overreach in comparing the routine announcement of the retirement of a legacy product line (DDR4) to a "complex and historically unprecedented change[] in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason" than a conspiracy. Opp. 18 (quoting *Twombly*, 550 U.S. at 556 n.4). Defendants announced the wind-down of DDR4 over a three-month period, and then exited that product on different timelines spaced out over more than six months. Compl. ¶ 260. There are no allegations that this was in any sense extraordinary.

Moreover, Plaintiffs' allegation that Chinese manufacturers were ramping DDR4 production and halving prices provide yet another reason for Defendants' retirement of DDR4. Plaintiffs insist that Defendants should have "cut prices or defended their market share" in response to Chinese competition. Opp. 18. But they never explain why that would be rational when Defendants were making much better margins by "steering scarce capacity to HBM and advanced nodes that th[e Chinese] producers [we]re legally barred from making." Compl. ¶ 440. Given that "resisting competition is routine market conduct" in an oligopoly, and Defendants could make better returns by focusing on segments in which there was not Chinese competition, "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Twombly*, 550 U.S. at 566.

**2. Based on Plaintiffs' allegations, Defendants' business strategy changes were independent responses to common stimuli.**

Plaintiffs purport to identify "simultaneous shift[s] in business strategy indicat[ing] the existence of an anticompetitive agreement to restrict output," Opp. 20, but what their allegations actually establish are "independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4 (quoting P. AREEDA & H. HOVENKAMP, ANTITRUST LAW ¶ 1425). In particular, Plaintiffs cite Samsung's unilateral

decision to cut output in April 2023, Micron's Crucial announcement in December 2025, and SK hynix's alleged "abandon[ment of] its longstanding emphasis on OEM supply relationships" as evidence of a supposed break from the past. Opp. 19–20; Compl. ¶¶ 306, 360–61, 363. But even if Defendants were to accept that each Defendant "shifted its own bespoke business strategy away from its historical advantages," Opp. 19, the Ninth Circuit held in *DRAM II* that "industry-wide change[s] in strategy" like this are an expected feature of interdependent markets. 28 F.4th at 51–52 (rejecting plus-factor allegation that "Defendants' conduct changed between the start and end of the alleged conspiracy" as "insufficient to establish a plausible conspiracy").

Once again, these strategy changes are just as consistent with explosive growth in AI demand as they are with conspiracy (if not more so). Plaintiffs allege that "[t]he growth of artificial intelligence drove buyers to acquire memory in volumes the industry had not seen," Compl. ¶ 8, with AI customers purchasing astonishing quantities of memory, *id.* ¶ 14 (single customer announcing strategic partnership contemplating potential volumes equal to 40% of global DRAM output). With an industry disruption on that scale, there was every reason for Defendants to rethink their historical strategies. *See Twombly*, 550 U.S. at 566 ("[T]here is no reason to infer that the companies had agreed among themselves to do what was only natural anyway.").

**3. Ordinary investor communications do not move the needle to plausibility.**

Plaintiffs recast Defendants' typical quarterly earnings commentary as assurances exchanged among rivals about an antitrust conspiracy. Opp. 20–21. To the contrary, the statements in the Complaint are "indications of [Defendants'] own future behavior and descriptions of their past behavior, predictions of industry trends, and observations about competitor behavior," and they "are insufficient to support an inference of conspiracy because they are not 'largely inconsistent with unilateral, lawful conduct.'" *Jones*, 400 F. Supp. 3d at 918–19 (quoting *Musical Instruments*, 798 F.3d at 1194); *see also* Mot. 20–21.

Market observations typical of investor communications do not provide a basis to infer a conspiracy. *See DRAM II*, 28 F.4th at 50 ("If no conspiracy existed, Defendants would likely make the same public statements about their observations, predictions, and strategies for the future,

particularly in response to investor and analyst questions."). Plaintiffs' authority recognizes as much. The statements at issue in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, for instance, included a defendant's boasts that it had succeeded in convincing its competitors to cut capacity, after which two rivals announced cuts of their own; the court held these statements to be tantamount to "an invitation, followed by responsive assurances and conduct" supporting the inference of a conspiracy. 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008) (noting those allegations alongside private exchanges of pricing information and a pending criminal grand-jury investigation). No Defendant here is alleged to have invited anything or claimed credit for persuading a rival to restrain output.

The Ninth Circuit in *DRAM II* considered and rejected a closer case: Micron's public statement that it would "be foolish [for Micron] to be the first ones to take capacity off," allegedly paired with a "clear reassurance that Micron would not try to take DRAM market share" and answered within a month by both rivals announcing capex cuts. 28 F.4th at 50–51; Mot. 21. The Ninth Circuit held that this conduct, substantially closer in time and more obviously responsive than the allegations here, did *not* qualify as a plus factor. 28 F.4th. at 50–51. That conclusion applies with even more force here.

**4. Plaintiffs do not plausibly allege that customer vetting served as a monitoring mechanism.**

Plaintiffs' "customer vetting" allegations include that Defendants questioned customers about end-user identity, order quantities, and whether reported demand was real. Compl. ¶¶ 330–334. But these allegations amount to only ordinary demand management during a shortage, an economic reality the Complaint describes repeatedly. *See id.* ¶¶ 182, 184, 249, 281. Indeed, Plaintiffs offer the obvious and non-conspiratorial explanation for this conduct: booming AI demand had consumed available capacity and suppliers deprioritized customers who had "brutally cut prices and slashed orders over the past few years when end markets were weak." *Id.* ¶ 332.

Plaintiffs liken the vetting to the "exchang[e of] 'information on sales of DRAM to certain customers, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.'" Opp. 19 (quoting Compl. ¶ 334). But Plaintiffs never allege that *any* of Defendants exchanged vetting information or that any of the vetting information related to pricing. Their reliance on *In re*

*Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010), is misplaced. That case did not involve order screening. Rather, it involved the direct exchange of price information at trade-association meetings, an "elite 'leadership council'" whose "stated mission was to urge its members to substitute 'co-opetition' for competition," and a *simultaneous* industry-wide shift from "heterogeneous and complex" pricing to a uniform structure, accompanied by a one-third price increase. *Id.* at 628. Plaintiffs allege nothing of the sort.

**5. Plaintiffs' "opportunities to conspire" argument falls flat.**

Plaintiffs state the governing standard for "opportunities to conspire" and then fail to meet it. They acknowledge that *DRAM II* discounted trade-association allegations because they did "not allege facts demonstrating that Defendants actually communicated or exchanged information at these trade association meetings." Opp. 21 (quoting 28 F.4th at 52). There is nothing to distinguish the analogous allegations in the Complaint here. Although the Complaint names industry gatherings, dates, and executives who appeared together, Compl. ¶¶ 402-04, it does not allege one word that any Defendant said or heard. "[S]imply because Defendants could talk to competitors does not mean that they did." *DRAM II*, 2020 WL 8459279, at *10. "[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." *Musical Instruments*, 798 F.3d at 1196; *see also* Mot. 17–18.

Plaintiffs' efforts to correlate specific industry developments to four conferences, Opp. 21, fail as well. The Complaint itself explains that Defendants' employees routinely attended the same events multiple times per year. Compl. ¶ 402 ("[R]epresentatives from each Defendant are often grouped together for various conferences."). Plaintiffs "selected four trade association meetings from this set" but did "not allege facts explaining why these four meetings in particular [were] noteworthy" or otherwise connected to the developments. *See Jones*, 400 F. Supp. 3d at 918. These allegations are just as implausible as the ones the courts rejected in *DRAM II*.

**6. Market structure is a neutral fact.**

Plaintiffs' market-structure allegation restates the realities of an interdependent market: concentration, a standardized product, published quarterly prices, and barriers to entry. Opp. 21–22; *see Musical Instruments*, 798 F.3d at 1195; *see also Jones*, 400 F. Supp. 3d at 922 (quoting

*Prosterman*, 747 F. App'x at 461–62) (conscious parallelism is "endemic to an oligopoly"). Plaintiffs' authority treats additional plus factors as necessary, not optional: Concentration "*may* suggest conspiracy, particularly *when accompanied by other plausible plus factor allegations*." *DRAM II*, 28 F.4th at 52 (emphasis added). Standing alone, market structure suggests nothing, because a highly concentrated market protected by high entry barriers is precisely where lawful conscious parallelism is most expected to manifest.

Furthermore, Plaintiffs' authority is distinguishable. *Flextronics* concerned an express invitation to collude—a trade-association chairman telling members "it is not the time to reduce prices"—as well as confidential, forward-looking exchanges at private meetings, employee acknowledgments that those exchanges would be compliance violations, and an overlapping DOJ-amnesty conspiracy. *Flextronics,* 2023 WL 4677017, at *2–4. Plaintiffs plead no invitation, no private exchange, and no investigation of the conduct alleged here.

**7. Decades-old history does not save Plaintiffs' implausible theories.**

In *DRAM II*, the Ninth Circuit rejected the exact allegations and arguments that Plaintiffs advance here—that the then-fifteen-year-old activity (now over twenty years old) provided a basis to allow the claims to go forward. 28 F.4th at 53–54. Plaintiffs respond that the other plus factors they identify "supply that support." Opp. 22. But that argument is circular: Those allegations, as demonstrated above, do not qualify as plus factors. Moreover, Plaintiffs plead no specific link between the 1998–2002 conduct and the conduct alleged here—no common individuals, no common mechanisms, and no continuation of information exchanges—that would make that decades-old history relevant to the current claims. Mot. 22–23; *cf. In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1149 (N.D. Cal. 2009) (drawing inference where seven employees involved in DRAM investigations had responsibility for pricing and sales of the product at issue).

**C. "Holistic" review confirms the Complaint should be dismissed.**

Plaintiffs cannot overcome their pleading problems by insisting that their allegations should be evaluated holistically, because those allegations are just as implausible when viewed as a whole. Yes, the Court must "consider each purported plus factor in turn and cumulatively to determine whether Plaintiffs' allegations amount to stating a plausible claim under Section 1." *DRAM II*, 28

F.4th at 47–48. But implausible plus factors are "insufficient to plead a case," "whether taken singly or together." *In re Late Fee*, 528 F. Supp. 2d at 963. Conduct "more likely explained by lawful, unchoreographed free-market behavior" remains so whether examined one at a time or together. *DRAM II*, 28 F.4th at 54.

Defendants likewise do not ask the Court to credit "fact-bound explanations" outside the pleadings. Opp. 22. As in *DRAM II*, "[t]he plausibility of Plaintiffs' theory is undercut by [the] allegations in the[ir] complaint." 28 F.4th at 49. Defendants' "explanations" derive directly from the Complaint, which describes the downturn and multibillion-dollar losses that preceded the cuts, Compl. ¶¶ 7, 241; the AI-driven demand shock that made HBM attractive, *id.* ¶¶ 8, 251, 354; the multi-year fab timelines and equipment constraints that limited expansion, *id.* ¶¶ 81, 85; Micron's independent reasons for exiting Crucial, *id.* ¶ 323; and the overbooking rationale for customer vetting, *id.* ¶¶ 16, 332. And here, as in *DRAM II*, "the totality of Plaintiffs' allegations does not suggest anything more than conscious parallelism." 28 F.4th at 53. Defendants cite dozens of these allegations and rely on no facts not specifically alleged in the Complaint.

**D. Plaintiffs cannot distinguish this case from *DRAM II.***

Plaintiffs attempt to distinguish their allegations from *DRAM II* by pointing to references to HBM, DDR4, customer vetting, long-term contracting, and Crucial. But those allegations do not change the underlying pleading defect, and only underscore the extent to which Plaintiffs recycled their allegations from the failed complaint in *DRAM II*. The *DRAM II* plaintiffs alleged parallel conduct based on "Defendants contemporaneously restrict[ing] their DRAM production during the class period" and "plus factors" including "complex, simultaneous, and historically unprecedented decreases in capital investment;" "supply cuts against Defendants' self-interest;" "public statements encouraging supply cuts;" "changed conduct between the start and end of the class period;" "information exchanges between Defendants regarding future supply and demand;" "high market concentration;" and "prior criminal convictions for price fixing." 28 F.4th at 47. That is this case. *See* Compl. ¶ 227; Opp. 13–22 (listing identical or nearly identical plus factors).

The differences between this case and *DRAM II* make Plaintiffs' claims here *less* plausible. For example, the *DRAM II* plaintiffs alleged that a Samsung executive ordered a price leak

"intending that Samsung's competitors would learn of its plan and follow suit." *DRAM II*, 28 F.4th at 48. Even that insider allegation failed as a plus factor. *Id.* Here, Plaintiffs offer nothing similar. The *DRAM II* plaintiffs pleaded specific lost profits, yet the court held Defendants' supply cuts to be "economically rational." *Id.* at 49–50. Here, Plaintiffs admit Defendants earned "record profits" from focusing on HBM and tempering conventional DRAM capacity. Compl. ¶¶ 407–11.

Plaintiffs say this case is the "opposite" of *DRAM II* because "two smaller producers" cut first and Samsung "followed," and the Ninth Circuit's decision "rested on the central premise that plaintiff[s] alleged what was essentially a 'follow the leader' theory." Opp. 23–24. But Plaintiffs cite nothing for the proposition that a "follow the leader" dynamic requires the first mover to have the highest market share—particularly where, as here, the top two participants' shares are alleged to be similar. Nor do the cases on which Plaintiffs rely take such a restricted view. *See Musical Instruments*, 798 F.3d at 1195 ("[O]ne firm can risk being the first to raise prices, confident that if its price is followed, all firms will benefit."); *DRAM II*, 28 F.4th at 48 n.3; *see also In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 874 (7th Cir. 2015) (describing "the first firm" to raise prices as "the price leader"). Ultimately, the Ninth Circuit evaluated these *same* Defendants in the *same* market and held that very similar "allegations d[id] not suggest anything more than conscious parallelism." *DRAM II*, 28 F.4th at 53. This Court should do the same.

**E. Plaintiffs' state-law claims fail with their federal claim.**

Plaintiffs concede that their state-law claims—Counts II through VI—"rest on the same alleged anticompetitive agreement supporting Count I" and should be resolved "for the same reasons." Opp. 12 n.2. Because Count I fails, Counts II through VI fail as well. Mot. 23–24.

**F. Plaintiffs' request for leave to amend should be denied.**

Plaintiffs request leave to amend, asserting that "any . . . insufficiency could be cured through amendment." Opp. 24. But they identify no fact they would add, and any amendment would therefore be futile. Their request for leave to amend therefore should be denied. *See, e.g., Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

## III. CONCLUSION

The Court should dismiss the Complaint.

Dated: October 7, 2026

Respectfully submitted,

By: */s/ Heather S. Nyong'o*

HEATHER S. NYONG'O (S.B. #222202)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California Street, Suite 2400
San Francisco, CA 94108
Telephone: (415) 796-4480
hnyongo@cgsh.com

BRIAN BYRNE (S.B. #181362)
YE EUN (CHARLOTTE) CHUN (S.B. #331459)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
151 University Avenue
Palo Alto, CA 94301
Telephone: (650) 815-4110
bbyrne@cgsh.com
chchun@cgsh.com

STEVEN J. KAISER*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1554
skaiser@cgsh.com
*Admitted *Pro Hac Vice*

*Counsel for Defendants SK hynix Inc. and SK hynix America Inc.*

By: */s/ Diana Aguilar Aldape*

DIANA A. AGUILAR ALDAPE (S.B. #304427)
SARA N. PAHLAVAN (S.B. #332945)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: (415) 984-8700
daguilar@omm.com
spahlavan@omm.com

IAN SIMMONS*
BRIAN P. QUINN*
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
isimmons@omm.com
bquinn@omm.com
*Admitted *Pro Hac Vice*

*Counsel for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*

By: *\/s/ Rachel S. Brass*

RACHEL S. BRASS (S.B. # 219301)
JULIAN KLEINBRODT (S.B. # 302085)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8293
rbrass@gibsondunn.com
jkleinbrodt@gibsondunn.com

BLAINE H. EVANSON (S.B. # 254338)
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone: (949) 451-3805
bevanson@gibsondunn.com

*Counsel for Defendant Micron Technology, Inc.*

**ATTESTATION OF CONCURRENCE IN FILING**

Pursuant to Local Rule 5-1(i)(3), I attest that the signatories listed, on whose behalf the filing is submitted, concur in the filing's content and have authorized the e-filing of this document.

Dated: October 7, 2026

Respectfully submitted,

By: */s/ Heather S. Nyong'o*

Heather S. Nyong'o

*Counsel for Defendants SK hynix Inc. and SK hynix America Inc.*